Sharon Ann JENNINGS, Individually as heir and personal representative of the Estate of Charles Paul Jennings, deceased, and as mother and guardian ad litem of Rachael Jennings, minor child,

v.

The BOEING COMPANY, a corporation.

Civ. A. No. 86–6639.

United States District Court, E.D. Pennsylvania.

May 18, 1987.

John J. Carlino, Nicholas Gilman, Smiley, Olson, Gilman, Pangia, Philadelphia, Pa., for plaintiff.

F. Hastings Griffin, Jr., E. David Chanin, Dechert, Price & Rhoads, Philadelphia, Pa., Keith Gerrard, Steven S. Bell, Perkins & Coie, Seattle, Wash., for defendant.

## MEMORANDUM OPINION AND ORDER

VANARTSDALEN, Senior District Judge.

On November 6, 1986, a Boeing Vertol 234 Chinook helicopter crashed into the North Sea approximately 2.5 miles off the Shetland Islands, Scotland, with forty-seven persons aboard. Killed in the crash were 45 persons, all of whom, except for three crew members, were workers at the Brent Oil platform in the North Sea. One passenger and one crew member survived. All passengers and crew were apparently British subjects. At the time of the crash, the helicopter, which had been manufactured by the Boeing Company (Boeing) in Pennsylvania, was owned and operated by British International Helicopters (BIH). The helicopter was ferrying the workers from the off-shore oil drilling platform to the Shetland Islands. The British Department of Transport, Accidents Investigation Branch (AIB), determined after a preliminary investigation that the accident resulted from a catastrophic failure of the aircraft's forward transmission spiral bevel gear.[1] The AIB's investigation of the accident is ongoing.

On November 12, 1986, Sharon Ann Jennings filed this action invoking the court's diversity and admiralty jurisdiction and seeking to recover damages arising from the death of her husband, Charles Paul Jennings, who was a British subject and resident and a passenger in the ill-fated

---

1. This gear had recently been modified by the helicopter's former owner, British Airways Helicopters, Ltd. (BAH), and British contractors pursuant to a Boeing Vertol Service Bulletin prepared by Boeing in conjunction with and with the approval of the United States Federal Aviation Administration (FAA) and the British Civil Aviation Authority. Since the accident, defects have been discovered in similarly modified gears in other Boeing Vertol 234 helicopters owned by BIH and owned by other parties not involved in this action.

helicopter. The complaint alleges causes of action against Boeing based on gross negligence, strict liability and breach of warranty, and seeks recovery of compensatory and punitive damages.

On January 21, 1987, Boeing filed a motion to dismiss on the grounds of forum non conveniens, agreeing that in the event dismissal was granted, Boeing would submit to the jurisdiction of the English or Scottish courts, waive any statute of limitations defense in any action filed in those courts by the plaintiff within one year, not contest liability for compensatory damages, and pay any judgment for damages awarded in those courts.[2] Upon plaintiff's request, an extension was granted giving the plaintiff until April 1, 1987, to file a response.[3] The briefing being complete, this motion is now ripe for decision.[4]

At the outset, the litigation strategies of both parties should be squarely faced. Despite all of the argument about convenience of the parties, in reality, plaintiff wants the action to proceed in this district because she believes that, under choice of law rules, the substantive law that will be applied in this forum will probably result in a more favorable plaintiff's verdict. Specifically, the plaintiff contends that if tried here, the substantive law of Pennsylvania would be applicable; that law, with its availability of strict liability theories, more liberal measure of damages, and the possible right to punitive damages, would make this court a more attractive forum for her. Plaintiff clearly has not chosen to file this action in this court because it is convenient for her. She is a resident of the United Kingdom. She undoubtedly has filed here *solely* to take advantage of what she perceives to be the more favorable law. As the Supreme Court noted in *Piper Aircraft Co. v. Rey-*

*no*, 454 U.S. 235, 249 n. 15, 102 S.Ct. 252, 262 n. 15, 70 L.Ed.2d 419 (1981), "dismissal may be warranted where a plaintiff chooses a particular forum, not because it is convenient, but solely in order to ... take advantage of favorable law."

Defendant, conversely, seeks to force the litigation to proceed in the courts of England or Scotland because it believes that any ultimate recovery in those courts is likely to be less than in this court. Defendant appears to be primarily concerned with the danger of an award against it for punitive damages. Boeing is of the opinion, concurred in by plaintiff, that punitive damages would not be recoverable under English or Scottish law.

 Where the substantive law of an alternative forum is less favorable than that of the original forum, any decision on an issue of forum non conveniens will ordinarily result in the application of law more favorable to one party. It is probably for this reason, at least to some extent, that the Supreme Court stated in *Reyno:*

> The Court of Appeals erred in holding that plaintiffs may defeat a motion to dismiss on the ground of *forum non conveniens* merely by showing that the substantive law that would be applied in the alternative forum is less favorable to the plaintiffs than that of the present forum. The possibility of a change in substantive law *should ordinarily not be given conclusive or even substantial weight* in the *forum non conveniens* inquiry.

454 U.S. at 247, 102 S.Ct. at 261 (emphasis added). The issue of overriding importance in a forum non conveniens analysis is that of convenience. *See id.* at 249, 102 S.Ct. at 262 ("If substantial weight were given to the possibility of an unfavorable change in

**2.** Boeing contends that it had previously offered not to contest liability and to promptly litigate the issues of damages in United Kingdom courts, but the plaintiff rejected that offer and instead filed this action. The plaintiff denies receiving any such offer.

**3.** The extension was granted in part in response plaintiff's contention that additional time was needed in which to research difficult issues of foreign law; however, the plaintiff presented no

evidence or authorities regarding the issues of English or Scottish law in her memoranda or at oral argument.

**4.** In addition to plaintiff's memorandum in opposition to the motion, plaintiff filed two affidavits; defendant thereafter filed a reply brief and three supplementary reply briefs and plaintiff has filed a "surrebuttal." Extensive oral argument was held on May 7, 1987.

law, however, dismissal might be barred even where trial in the chosen forum was plainly inconvenient.").

■■■ The principle of forum non conveniens permits the court to decline otherwise proper jurisdiction over an action where the convenience of the parties and witnesses, or the administrative constraints on the court, would be better served by allowing the action to proceed in a different available forum. *Dahl v. United Technologies Corp.*, 632 F.2d 1027, 1029 (3d Cir.1980). Analysis of a forum non conveniens motion is flexible, and relies on careful consideration of a number of factors.[5] These factors were first set forth with respect to federal courts by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), and involve the balancing of certain private and public interests. These oft-cited factors merit close attention, but are not reached unless it is first established that an appropriate alternative forum exists. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 265 n. 22.

In this case, the potential alternative fora are Scotland and England. The plaintiff does not dispute the fact that ordinarily courts of these countries of the United Kingdom are adequate alternatives to United States courts. Indeed, in *Reyno* itself, the Supreme Court recognized that the Scottish courts are adequate fora for the resolution of personal injury actions even though a plaintiff may not be able to rely on a strict liability theory and the potential damages award may be less. *Reyno*, 454 U.S. at 254–255, 102 S.Ct. at 265.

The plaintiff argues that United Kingdom courts would be inadequate because their application of Scottish or British law to this case would deprive the plaintiff of a right secured by the Treaty of Friendship, Commerce and Navigation, January 21, 1950, United States-Ireland, Article IV(1), 1 U.S.T. 788, 790, T.I.A.S. No. 2155 (Treaty), that asserted right being the right to recover punitive damages under Pennsylvania

law. Article IV(1) of the Treaty provides in pertinent part that "[n]ationals of either Party shall be accorded national treatment in the application of laws and regulations within the territories of the other Party that (a) establish a right of recovery for injury or death." "National treatment" is defined as "treatment accorded within the territories of a Party upon terms no less favorable than the treatment accorded therein, *in like situations,* to nationals ... of such Party." Treaty, Art. XXI(1), 1 U.S.T. at 801 (emphasis added).

Because the plaintiff holds dual citizenship of Great Britain and the Republic of Ireland, she is entitled to the national treatment secured by the Treaty. Plaintiff has invoked this court's diversity and admiralty jurisdiction. As an Irish citizen, she is entitled to the same rights of recovery afforded to any citizen of a State of the Union, other than Pennsylvania, who files a diversity action in this federal district court. To the extent that such a plaintiff would be entitled to recover punitive damages under the laws and regulations within the United States, so may Mrs. Jennings. But equally, to the extent that the court may consider and dismiss a case for forum non conveniens as to an American nonresident of Pennsylvania who files an action in Pennsylvania, so may it dismiss an action as to an Irish citizen. The Treaty provides for similar treatment in like situations; clearly it affords Irish citizens no greater rights than those afforded to United States citizens. Therefore, if a diversity action filed by an American citizen may be dismissed even though such a dismissal might result in the loss of a potential punitive damages award, so may such an action be dismissed when filed by an Irish citizen entitled to national treatment under the Treaty.

■■■ In *Reyno*, a products liability action was brought in federal court by the personal representative of the estates of Scottish citizens killed in an airplane crash in the Scottish Highlands. The personal

---

**5.** "The *forum non conveniens* determination is committed to the sound discretion of the trial court." *Reyno,* 454 U.S. at 257, 102 S.Ct. at 266.

representative was a California resident and a United States citizen. The defendants were the Pennsylvania manufacturer of the plane and the Ohio manufacturer of the plane's propellers, while the plane itself was registered in Great Britain and was owned and operated by companies organized in the United Kingdom. In that case, the Court held that the fact that adjudication of the action in Scotland instead of the United States could result in a smaller damages award did not bar dismissal on forum non conveniens grounds. 454 U.S. at 255, 102 S.Ct. at 265. Although *Reyno* dealt with a reduction in compensatory damages, and did not expressly address the loss of punitive damages, the Court's reasoning is clearly applicable to such a situation. It is well settled under Pennsylvania law that the right to recover punitive damages is not an independent cause of action, but is merely one measure of damages, which, in addition to compensatory damages, is available in proper cases. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243, 1265 (1983). Under *Reyno*, therefore, the possibility that a forum non conveniens dismissal of an *American* plaintiff's action would result in the loss of a potential punitive damages award does not, in and of itself, preclude the dismissal of the action.[6] Accordingly, it would not preclude the dismissal of an action brought by an Irish citizen.

Moreover, it is by no means certain that punitive damages would in any event be available under Pennsylvania law against the manufacturer of a defective product. The right to punitive damages in a products liability action has been recognized in a few cases in federal court. *In re Air Crash at Mannheim, Germany*, 575 F.Supp. 521, 525 (E.D.Pa.1983), *rev'd*, 769 F.2d 115 (3d Cir.1985); *Neal v. Carey Canadian Mines, Ltd.*, 548 F.Supp. 357, 376–

377 (E.D.Pa.1982), *aff'd sub nom. Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481 (3d Cir.1985). Although the evidence which plaintiff contends she will be able to produce, all of which is seriously disputed by defendant, may show such egregious or reckless conduct as to justify a punitive damage award under Pennsylvania law, there is grave uncertainty as to whether punitive damages may ever be awarded in a products liability case under Pennsylvania law. The issue was expressly reserved by the Supreme Court of Pennsylvania when it disallowed an award of punitive damages in an asbestos injury case. *Martin v. Johns-Manville Corp.*, 508 Pa. 154, 494 A.2d 1088, 1094 (1985).

Likewise, the plaintiff's argument that dismissal will deprive her of a right to seek punitive damages proceeds upon the assumption that Pennsylvania law will of necessity apply if this case goes forward in this forum and will not apply if the case proceeds in England or Scotland. This is by no means a foregone conclusion. In diversity actions, a district court's choice of law determination is governed by the choice of law rules of the forum state. Pennsylvania has essentially adopted a modified version of the "most significant relationship" test. *See Shields v. Consolidated Rail Corp.*, 810 F.2d 397, 399–400 (3d Cir.1987). Under this test, it is not inconceivable that a federal court sitting in diversity might apply the law of Scotland to the issue of damages. *See Abiaad v. General Motors Corp.*, 538 F.Supp. 537, 543 (E.D.Pa.), *aff'd*, 696 F.2d 980 (3d Cir. 1982) (Applying foreign law, rather than Pennsylvania law, to an action against the manufacturer of a car produced in the United States arising out of an accident in Abu Dhabi caused by defect in the car).

---

**6.** The plaintiff argues that the *Reyno* plaintiff in actuality was a foreign plaintiff, not a California resident. The Court did note at the outset of its opinion that the personal representative was not related to and did not know the decedents; she was the legal secretary to the attorney who filed the suit. *Reyno*, 454 U.S. at 239, 102 S.Ct. at 257. The Court did not, however, accord this fact any special significance and did not make

reference to it in its discussion regarding the likelihood of a reduced damages award. Instead the Court focused on the practical problems inherent in a forum non conveniens analysis hinging on a comparison of local and foreign substantive law, problems present regardless of whether the personal representative is a United States or foreign citizen.

■ The plaintiff's assumption that Pennsylvania law would govern the scope of recovery is also belied by the fact that federal admiralty law is applicable to this case. It is undisputed that this accident occurred in the North Sea at a point 2.5 miles distant from the Shetland Islands, an archipelago off the coast of Northern Scotland. At the time of the accident, the helicopter was ferrying passengers from an offshore drilling platform to land, an operation traditionally conducted by seagoing vessels. The crash of the helicopter bears a sufficiently significant relationship to traditional maritime activity as to give rise to admiralty jurisdiction. *Offshore Logistics, Inc. v. Tallentire,* — U.S. —, 106 S.Ct. 2485, 2493, 91 L.Ed.2d 174 (1986) (crash of helicopter used to ferry oil platform workers to land is within admiralty jurisdiction). The complaint itself alleges as an alternative basis for jurisdiction this court's admiralty jurisdiction. Two causes of action for wrongful death, one statutory and one of general maritime law, exist under federal admiralty law. Neither of these causes of action provides for recovery of punitive damages for wrongful death.

■ The statutory cause of action was created by Congress in the Death on the High Seas Act (DOHSA), 46 U.S.C. § 761 in 1920. Congress passed DOHSA in response to the inconsistencies created by the Supreme Court's decision in *The Harrisburg,* 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886), in which the Court held that in absence of an applicable statute, general federal maritime law did not recognize a wrongful death action for deaths caused on the high seas and navigable waters. In the wake of *The Harrisburg,* state law was applied by some courts to wrongful deaths occurring within a state's territorial waters, yet the survivors of persons who died beyond that point were left without any

remedy. *Offshore Logistics,* 106 S.Ct. at 2490–2491; *Moragne v. States Marine Lines,* 398 U.S. 375, 393, 90 S.Ct. 1772, 1783, 26 L.Ed.2d 339 (1970). In an attempt to provide a uniform and effective wrongful death remedy for deaths occurring beyond the territorial waters of the individual states, Congress enacted DOHSA. Section 761 of the act provides:

Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued.

Because the accident in this case occurred more than a marine league (ordinarily defined as three miles) beyond the shore of any state of the United States, DOHSA on its face is applicable to this case. No punitive damages are recoverable under DOHSA; recovery is limited under section 762 to "fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought." 46 U.S.C. § 762; *Green v. Ross,* 338 F.Supp. 365, 367 (D.C.Fla.1972), *aff'd,* 481 F.2d 102 (5th Cir.), *cert. denied,* 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473 (1973). Moreover, because the application of DOHSA precludes the recovery of damages for wrongful death pursuant to state law, *Offshore Logistics,* 106 S.Ct. at 2500, punitive damages provided by state law are not available in this wrongful death action.[7]

7. Plaintiff's survival action under state law, which may possibly allow punitive damages, is not precluded or "preempted" by DOHSA. *Offshore Logistics,* 106 S.Ct. at 2491 n. 1 (reserving the issue); *Dugas v. National Aircraft Corp.,* 438 F.2d 1386 (3d Cir.1971). Assuming the Pennsylvania Survival Act, 42 Pa.Cons.Stat.Ann. § 8302, is applicable as a statutory matter to actions occurring in the North Sea, its applicability in this case will depend upon the proper application of choice of law principles by the court trying the case. Therefore, "transferring" this case to Great Britain will not necessarily eliminate this right; neither will retaining jurisdiction in this court necessarily preserve the right.

Because of the specific location of the accident in question, however, an issue arises as to whether Congress intended DOHSA to reach deaths occurring within the territorial waters of foreign states. As set forth in section 761, DOHSA applies where the death occurs "on the high seas beyond a marine league from the shore of any State." 46 U.S.C. § 761. A number of courts have interpreted this language to extend the statute's reach to any waters located beyond a marine league from the United States coastline. *E.g., Sanchez v. Loffland Brothers Co.*, 626 F.2d 1228, 1230 n. 4 (5th Cir.1980), *cert. denied*, 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 974 (1981) (inland lake in Venezuela); *Moyer v. Klosters Rederi*, 645 F.Supp. 620, 623–624 (S.D. Fla.1986) (territorial waters of Mexico); *In re Air Crash Disaster Near Bombay, India On January 1, 1978*, 531 F.Supp. 1175, 1183 (W.D.Wash.1982) (territorial waters of India); *contra Roberts v. United States*, 498 F.2d 520, 524 (9th Cir.), *cert. denied*, 419 U.S. 1070, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974) (although not deciding the issue, court hesitant to hold that foreign territorial waters are "high seas" within meaning of DOHSA).

▆ Under generally accepted principles of international law, the navigable sea is divided into three zones: inland waters; territorial waters extending seaward from a defined coastal baseline; and the high seas, being international waters beyond the limit of the territorial sea.[8] *United States v. Louisiana* (*Louisiana Boundary Case*), 394 U.S. 11, 22–23, 89 S.Ct. 773, 780–781, 22 L.Ed.2d 44 (1969); *see generally* I. Brownlie, *Principles of Public International Law* at 183–184 (3d ed. 1979); Sweeney, Oliver & Leech, *The International Legal System* at 160–165 (2d ed. 1981). If in enacting DOHSA, Congress intended to incorporate the generally accepted meaning of "high seas," this accident would not be within the scope of the act. An examination of the statute's language and purpose, however, convinces me that the statute properly applies to accidents occurring within foreign territorial waters.

By its own terms, the act applies to deaths occurring on the high seas. From this broad geographic area, an exception of sorts is carved out; the act is only applicable to deaths on the high seas "beyond a marine league from the shore of any State" of the United States. Clearly if Congress had been using the term "high seas" in the generally accepted international sense, there would have been no need to carve out that exception. The territorial waters extending from the coastal states a distance of a marine league are not included within the classic definition of "high seas." *See In re Air Crash Near Bombay*, 531 F.Supp. at 1183. It is proper, therefore, to infer that the term high seas was used to refer to all waters beyond the United States coast, otherwise the phrase "beyond a marine league" would be superfluous.

This construction of the statute is consistent with Congress' underlying purpose, the development of a uniform effective federal maritime tort action for wrongful death. Congress was aware that deaths occurring within territorial waters of the states were subject to state tort law, and sought to provide a remedy for wrongful deaths which occurred beyond the reach of those state statutes. *Moragne*, 398 U.S. at 393–394, 90 S.Ct. at 1783–1784. In doing so, Congress took special care to exclude deaths which occurred in United States territorial waters from the scope of DOHSA, hence the requirement that the death occur beyond a marine league from the United States coast. Because it was generally understood that the wrongful death statutes of the coastal states were not meant to apply to the high seas, including the territorial waters of foreign states, *see Moragne*, 398 U.S. at 393 n. 10, 90 S.Ct. at 1784 n. 10, there was no need to limit further the scope of DOHSA's application. The joint operation of DOHSA and the state statutes ensured the existence of remedies under United States law, either in the state or federal substantive law, for

---

8. The breadth of the territorial waters often depends on the claims of the coastal state, and the degree of acceptance afforded that claim by

other states. *See Louisiana Boundary Case,* 394 U.S. at 22 n. 24, 89 S.Ct. at 780 n. 24.

wrongful deaths occurring at any maritime situs,[9] providing that under choice of law principles, application of United States law was proper. For all these reasons the plaintiff's assumption that, if the case remains here, the law of Pennsylvania would apply so as to create a right to punitive damages appears to be extremely doubtful.

Having determined that the application of Article IV(1) of the Treaty does not prevent the consideration of a forum non conveniens dismissal, the focus of my analysis now shifts to an examination of the by now well known public and private interest factors. In balancing these factors, the critical concern is the issue of convenience. Dismissal is ordinarily appropriate where trial in the original forum "imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice." *Reyno*, 454 U.S. 235, 249, 102 S.Ct. 252, 262, 70 L.Ed.2d 419 (1982).

As a general matter, there is a strong presumption in favor of the plaintiff's choice of forum, which is overcome only where the balance of public and private interest factors weighs heavily in favor of the alternative forum. Less deference is given to the plaintiff's choice of a United States forum where the plaintiff is not a United States citizen or resident. *Id.* at 255–256, 102 S.Ct. at 265–266. The plaintiff argues that such disparate treat-

ment would violate Article VI(1)(c) of the Treaty, which requires equal treatment of Irish and United States citizens with respect to access to the courts of either nation. *See Farmanfarmaian v. Gulf Oil Corp.*, 588 F.2d 880, 882 (2d Cir.1978) (foreign plaintiff's right to sue in United States is of equal magnitude as that of United States citizen where "equal access to courts" treaty provision exists); *Grimandi v. Beech Aircraft Corp.*, 512 F.Supp. 764, 778 (D.Kan.1981). I find that even if the presumption is applied to the plaintiff's benefit, the public and private factors overwhelmingly favor dismissal in this case. Therefore, the issue whether the Treaty requires application of the presumption in favor of Irish citizens as if they were United States citizens need not be resolved.[10]

In *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), the Supreme Court set forth a list of private interest factors to guide the courts in weighing the convenience of the litigants. Those factors include the "relative ease of access to sources of proof; availability of compulsory process for attendance of the unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* Each of the factors, with the exception of the need for a view of the accident site

---

**9.** With the Supreme Court's decision in *Moragne,* a wrongful death remedy under general admiralty law was established for deaths occurring within the states' territorial waters. This *Moragne* action has been extended by some courts to deaths occurring beyond those waters to international waters and territorial waters of foreign states. *Sanchez,* 626 F.2d at 1230; *Public Adm'r of the County of New York v. Angela Compania Naviera,* 592 F.2d 58, 63 (2d Cir.), *cert. denied,* 443 U.S. 928, 100 S.Ct. 15, 61 L.Ed.2d 897 (1979). The extent of recovery under this general admiralty tort is controlled by the damages provisions of DOHSA, *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 623–626, 98 S.Ct. 2010, 2013–2015, 56 L.Ed.2d 581 (1978), and therefore no punitive damages would be recoverable under general admiralty law for wrongful death.

**10.** In that regard, however, I note that focusing on the plaintiff's foreign or United States citi-

zenship or residency distorts the purpose underlying the normal presumption and transforms it into a mechanical rule. The proper concern in a forum non conveniens case is convenience of the parties and the court. Where a plaintiff brings suit in a forum far distant from his or her home, be that home in a foreign nation or in a distant state of the United States, it is reasonable to infer that the plaintiff's choice of forum was based on factors other than the plaintiff's own convenience. Thus, as a practical matter, the presumptive appropriateness of a plaintiff's choice should be diminished where the plaintiff brings suit in a distant forum, and in this respect foreign and United States plaintiffs should be treated alike. *See Pain v. United Technologies Corp.,* 637 F.2d 775, 797 (D.C.Cir. 1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981).

which is not appropriate in this case, favors dismissal.

Of special significance in this case is Boeing's agreement that it will concede liability for compensatory damages if action is brought against it in the courts of England or Scotland. Obviously, if this occurs, the trial would be far more limited in scope, duration and complexity regardless of the forum. Pretrial discovery would likewise be limited only to damages. It is not without significance that the major part of the briefs thus far submitted involve details as to possible liability for the air crash and the alleged defective parts of the aircraft, all of which involve complex matters occurring in Scotland, England and the United States, including air regulatory bodies of both Britain and the United States. The concession would make the trial a simple issue of appropriate damages, unless the courts of the alternative forum would recognize a claim for punitive damages. Both parties assume that under British law punitive damages may not be awarded. It is at least conceivable, however, that under choice of law rules, a British court might apply the law of Pennsylvania or some other forum, especially with regard to any survival action. Likewise, if Boeing seeks contribution or indemnity from third parties in an alternative forum, trial of the issue of liability as between Boeing and those third parties would probably be necessary.

The balance of convenience with respect to the first private interest factor, the ease of access to sources of proof, weighs in favor of dismissal. If the trial were held in the British courts, it is likely that, at least with regard to the plaintiff's case, only evidence regarding damages issues would be required in light of Boeing's concession. Boeing correctly notes that there is no evidence relevant to damages in the United States. Documentary evidence, including tax forms, employment records and the like are presumedly all located in the United Kingdom. Likewise, live witnesses with relevant information regarding the decedent's health and life style are most likely located in the United Kingdom. Clearly the bulk of the relevant evidence and the witnesses with regards to damages are located in the alternative forum.

If trial were to take place in this district, necessitating the introduction of evidence regarding liability (which defendant would not concede if the case remains here), as well as damages, a substantial portion of the sources of proof would still be found outside the jurisdiction of this court. Obviously, evidence as to damages would be in the United Kingdom. Although some, and perhaps a significant portion, of the evidence regarding liability would be located in this district, much of that evidence as well is located elsewhere. The plaintiff's claim is based on strict liability for design defects in the helicopter's transmission, gross negligence on Boeing's part, and breach of warranty. The plaintiff argues that critical evidence in support of these claims is present in the United States; namely, Boeing documents and personnel related to the development and manufacture of the helicopter, as well as portions of the failed transmission being tested in Boeing facilities. While this evidence is certainly very important to liability issues, much of the critical evidence is in the United Kingdom. The investigation of the crash is being conducted by the British AIB; the documents generated by and the persons involved in that investigation will be extremely important pieces in the evidentiary puzzle of this case. Wreckage of the helicopter, including parts of the failed transmission, are also in the possession of the British authorities although some parts are presently in this district for testing. Records and witnesses regarding the maintenance performed on the craft by its owner and operator, BIH, and regarding transmission gear modifications made by British contractors, are also in the United Kingdom. Evidence regarding weather and flight conditions in the North Sea would also be located there. Given the location of the relevant evidence, it appears that wherever the trial is held, the greater amount of the relevant evidence, both qualitatively

and quantitatively is in the United Kingdom.[11]

Similar concerns are raised with respect to the availability and cost of obtaining attendance of witnesses at a trial or for depositions in this district. As previously noted, the large majority of witnesses in this case, with respect to liability and damages, most likely will be foreign witnesses. While procedures exist for obtaining documentary evidence and testimony abroad, such as the use of letters rogatory, these procedures are cumbersome and costly, and often fail to adequately secure full foreign discovery. *See Pain,* 637 F.2d at 789 (describing the procedural and practical inadequacies of foreign discovery); *see generally* Fed.R.Civ.P. 28(b); Multilateral Convention on the Taking of Evidence Abroad in Civil and Commercial Matters, March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444. This factor as well points toward dismissal.

An additional factor which favors dismissal of this action is Boeing's inability to implead potential third party defendants in an action in this country. *See Reyno,* 454 U.S. at 259, 102 S.Ct. at 267. Boeing argues that while the accident was clearly caused by a fatigue failure of the transmission gear, the cause of that failure itself is currently unknown. Boeing alleges that the failure could be due to improper modification of the gear by the prior owner of the helicopter, British Airways Helicopters, Ltd. (BAH), and its contractors, or improper maintenance of the aircraft transmission by BIH, or unique atmospheric conditions under which the helicopter regularly flew in service. If Boeing were able to establish either full or partial responsibility for the accident resting on BAH, BIH or the contractors, the extent of Boeing's own liability may be reduced or eliminated entirely. The plaintiff contends that BAH, BIH, and the contractors could not be brought into this action as third parties because the gear failure must be attributed to Boeing's conduct alone. This conclusion is based on the facts that Boeing's service bulletin contained detailed instructions for the modification of the gear, and that additional helicopters modified by parties other than BIH have exhibited partial failure of the gear. This issue is best left to a consideration of the merits of the case; it is premature at this stage to make conclusive determinations as to the actual cause of the gear failure and the respective responsibilities of the actors potentially involved in the accident.

BAH, BIH and the contractors do not appear to be subject to this court's personal jurisdiction. The plaintiff argues that BIH's predecessor corporation, BAH, is amenable to jurisdiction in this district because it is a wholly owned subsidiary of British Airways, a company currently maintaining a daily Philadelphia to London flight. Boeing contends that the British Airways subsidiary is actually not related to the now-defunct BAH which originally owned the helicopter in question; the BAH owned by British Airways is a new corporation which merely appropriated the "British Airways Helicopters, Ltd." name. Whatever the merit of Boeing's contentions, the tenuous contact of British Airways' Philadelphia operations is probably insufficient to obtain jurisdiction over the currently existing BAH in any event. Relying on that slim contact would, at best, require extensive litigation in the murky waters of "alter ego" theories of personal jurisdiction. As to BIH, there would be an even more unlikely possibility of making valid service, requiring additional inquiry into successor corporation liability and "presence" for purposes of service. Also, there is nothing of record to suggest that any of the individual contractors could be brought into an action before this court. *See Gehling v. St. George's School. of Medicine, Ltd.,* 773 F.2d 539, 541 (3d Cir.1985).

The Supreme Court noted in *Reyno* that "the problems posed by the inability to implead potential third-party defendants

---

**11.** In the event that issues of liability need to be litigated at all in the United Kingdom; for example, if the plaintiff were permitted to seek punitive damages with respect to her survival action, Boeing will be ordered to provide access to all relevant evidence regarding liability located in the United States as a condition of this dismissal. *See Reyno,* 454 U.S. at 257 n. 25, 102 S.Ct. at 267 n. 25.

*clearly supported* holding the trial in Scotland." 454 U.S. at 259, 102 S.Ct. at 267 (emphasis added). The Court so held even though it went on to opine in dictum that if found liable in the United States, the defendant could initiate an action for indemnity or contribution against other parties in Scotland. This dictum is at least subject to question by reason of a recent decision by the House of Lords filed March 3, 1987, *Comex Houlder Diving Ltd. v. Colne Fishing Company Ltd.*, slip op. (H.L. March 3, 1987) (Scot.).

In *Comex Houlder*, an action was brought in the Eastern District of Pennsylvania on behalf of the estate of a diver who drowned while making a dive in the North Sea from an oil rig operated by Texaco under instructions from Comex. After entry of a court-approved settlement and judgment under which Comex and Texaco both made payments to plaintiffs, Comex brought action against Colne Fishing Company, Ltd. and others for contribution in Scotland under Scottish statutes that provide generally for an action for contribution after payment of a judgment. The House of Lords determined that under the Scottish statute such an action for contribution could be maintained only if the judgment were obtained in Scotland. It is extremely doubtful, in view of that decision, that if Boeing is found liable in this court, it can maintain any indemnity or contribution action against other potentially responsible parties in Scotland.

Application of the *Gilbert* public interest factors also points toward dismissal of this action. Those factors include the administrative difficulties resulting from court congestion, the local interest in having localized controversies decided at home, and the interest in avoiding unnecessary problems in conflict of laws or in the application of foreign law. The first factor is, according to the Supreme Court, particularly relevant in cases like the present action. As the Supreme Court noted in *Reyno*, the American courts are extemely attractive to foreign plaintiffs, particularly because of more favorable tort law and more extensive discovery available in most United States courts. 454 U.S. at 252, 102 S.Ct. at

264. To date, ten other actions against Boeing have been filed in this district (upon removal from state court) on behalf of the estates of persons killed in the North Sea crash, and attorneys for the plaintiffs in those cases have asserted their intention to file additional actions on behalf of most of the remaining victims of the crash. Plaintiff's Petition for Remand at 1, *Zemp v. Boeing Vertol Company*, C.A. 87–1885 (E.D.Pa.). Each of these other actions was filed by Lucille Zemp, a Delaware resident appointed as administratrix for the ten decedents. Clearly, if this action is maintained here, this district will become the focus of all other actions arising from the crash causing increased congestion of United States courts. The congestion will be caused by the litigation of damages actions by air crash victims residing outside this district solely because the aircraft involved was manufactured in this district.

The second public interest factor, the interest in having localized controversies decided at home, involves a balancing of the original forum's interest in the litigation against that of the alternative forum. Certainly Pennsylvania, as the place of the helicopter's manufacture, has an interest in cases involving alleged defects in the aircraft. Likewise, the United States generally has an interest in the outcome of this suit, especially in light of the involvement of the federal government in the certification of aircraft manufactured in this country. *Reyno*, 454 U.S. at 260, 102 S.Ct. at 268; *Dahl*, 632 F.2d at 1032–1033. These interests are far less in comparison to the interests of the United Kingdom, and in particular Scotland.

Of course, the accident occurred in Scottish waters. The plaintiff claims that the location of the accident was, as it is in many air crashes, fortuitous. *See In re Air Crash at Mannheim, Germany*, 575 F.Supp. at 525 n. 7. This characterization is faulted, for the circumstances of this case demonstrate that the operations engaged in by the helicopter were of a local nature. The craft was not in Scottish territory at the time of the crash by happenstance; it was regularly engaged in trans-

porting workers from the North Sea platform to the Scottish Shetland Islands. The persons killed in the crash were all residents of the United Kingdom. The aircraft was owned and operated by a British company, and was subject to regulation both as to airworthiness certification and in-flight control by the British authorities. Moreover, the service bulletin which authorized the allegedly defective modification was approved by the British Civil Aviation Authority. The modifications were made by British or Scottish contractors in the United Kingdom.

The plaintiff has noted that Pennsylvania and the United States have an interest in regulating the conduct of manufacturers located within their borders. This is certainly true, and one method of regulation is the application of standards of reasonable conduct developed in the law of tort. Clearly the assessment of compensatory and punitive damages for negligent or otherwise wrongful conduct serves to regulate the behavior of actors in the marketplace, and particularly to deter the production of defective products. *See, e.g., Reyno v. Piper Aircraft Co.,* 630 F.2d 149, 167 (3d Cir.1980), *rev'd on other grounds,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Feld v. Merriam,* 314 Pa.Super. 414, 461 A.2d 225, 236 (1983) (purpose of punitive damages is to punish wrongdoer and to deter similar conduct in the future). The standard of conduct and the level of available damages represent the balance struck by Pennsylvania between the need for economic and technological stability and progress and the desire to protect the public from unreasonable risk. But the balance chosen by the Pennsylvania courts and the interests of the Commonwealth must be weighed against those of Scotland and the United Kingdom. Although Pennsylvania and the United States may have a generalized interest in deterring their residents from manufacturing defective products, the English and Scottish governments have an intensely local interest in regulating the sale and operation of aircraft within their territory.

There is no doubt that the sale and operation of commercial aircraft is a highly regulated activity in Scotland and England. The standard of care and the level of recoverable damages under the laws of those countries also represent an accommodation made between the need for efficient, economical aircraft and air transportation and the desire to protect the citizens and residents of those countries. Decisions in that regard will affect the price, type and quality of goods and services provided to the public in those countries by manufacturers like Boeing, and carriers like BIH. While the courts and body politic of Pennsylvania may have struck a different balance, the right of foreign nations to reach a different result cannot be ignored, especially where those results may be more appropriate for the economic and social conditions existing in those nations. *See Dahl,* 632 F.2d 1032–1033 (in crash of Norwegian helicopter in Norwegian territorial waters, Norway's interest in regulating aircraft and product safety is equal if not superior to American interest in similar regulation); *Harrison v. Wyeth Laboratories,* 510 F.Supp. 1, 4 (E.D. Pa.1980), *aff'd,* 676 F.2d 685 (3d Cir.1982) (in product liability action involving oral contraceptive manufactured in Pennsylvania and distributed in England, British government had stronger local interest in action).

In *Reyno,* the Supreme Court found that Scotland had an overriding interest in the litigation because the accident occurred in Scottish airspace, all the decedents were Scottish, and most of the prospective plaintiffs and defendants were either Scottish or English. 454 U.S. at 260, 102 S.Ct. at 268. Similar factors are obviously present in this case. The Court rejected the plaintiff's argument that the American interest in ensuring that American manufacturers are deterred from producing defective products, and that the additional deterrence obtainable because of higher American damages provisions, justified retaining the action in United States courts. In so deciding, the Court noted:

[T]he incremental deterrence that would be gained if this trial were held in an American court is likely to be insignificant. The American interest in this accident is simply not sufficient to justify the

enormous commitment of judical [sic] time and resources that would inevitably be required if the case were to be tried here.

454 U.S. at 260–261, 102 S.Ct. at 268. Although the incremental deterrence resulting from potential punitive damages cannot be termed insignificant, the Supreme Court's comment is of substantial relevance to this case.

Consideration of the private and public interest factors relevant to this case, therefore, establishes that dismissal on the grounds of forum non conveniens is appropriate under conditions that will be imposed.[12] These conditions are necessary to ensure that dismissal of the action in this district will not terminate the plaintiff's claims as a practical matter. *See Abiaad,* 538 F.Supp. at 544. These conditions are: Boeing must (1) submit itself to the jurisdiction of the English or Scottish courts for all purposes relevant to this cause of action; (2) waive any statute of limitations defense in any action filed in those courts by the plaintiff within one year from this date; (3) not contest its liability for compensatory damages; (4) provide plaintiff access to all relevant evidence in its custody and control located in the United States or elsewhere regarding issues of liability and/or damages including punitive damages in the event that such issues are appropriately raised in the plaintiff's subsequent action; and (5) pay any final judgment for damages, costs or attorney's fees of any kind awarded in the British or Scottish courts in the plaintiff's subsequent action (subject to any rights of appeal).

---

**12.** The fact that foreign law may be applicable to an action is often cited as a reason supporting dismissal. *E.g., Abiaad v. General Motors Corp.,* 538 F.Supp. 537, 543 (E.D.Pa.1982); *Grimandi v. Beech Aircraft Corp.,* 512 F.Supp. 764, 781 (D.Kan.1981). Because the other private and public interest factors point strongly toward dismissal of this action, I need not decide whether foreign law, as a matter of choice of law principles, would govern this case. As previously noted, it is by no means clear what law will be applied, regardless of the forum in which trial is held. Plaintiff's contentions, and the practical reasons for filing in this district, are founded on the assumptions that if trial is held in this district, the substantive law of Pennsylvania both as to liability and damages will apply; whereas, if trial is held in Scotland, Pennsylvania substantive law will not be applied. Neither assumption is necessarily correct.