## IN RE AIR CRASH DISASTER NEAR PEGGY'S COVE, NOVA SCOTIA ON SEPTEMBER 2, 1998.

### No. MDL 1269.

United States District Court, E.D. Pennsylvania.

Feb. 27, 2002.

### MEMORANDUM

GILES, Chief Judge.

## I. INTRODUCTION

Responsible for conducting consolidated pretrial proceedings in the Multidistrict Litigation arising from the crash of Swissair Flight No. 111 near Peggy's Cove, Nova Scotia, on September 2, 1998, the court now considers the motion of defendants The Boeing Co. ("Boeing") and McDonnell Douglas Corporation ("McDonnell Douglas"), joined by all other defendants, to dismiss all claims for punitive damages as precluded by the Death on the High Seas by Wrongful Act, as amended, 46 U.S.C. app. §§ 761–767 ("DOHSA"). They argue that DOHSA is the exclusive avenue open to plaintiffs for any monetary recovery.[1] For the reasons that follow,

---

1. This is one of two motions seeking to dismiss the claims for punitive damages. The other motion, joined by defendants Swissair, SR Technics AG, Sairgroup, and Delta Airlines, Inc., seeks dismissal of all claims for punitive damages on the ground that such claims are precluded by the Warsaw Convention.

defendants' motion is granted and judgment is entered in favor of the defendants as to all claims for punitive damages.

## II. BACKGROUND

Swissair Flight No. 111, a McDonnell–Douglas MD–11 aircraft, departed from New York City's John F. Kennedy Airport en route to Geneva, Switzerland. Although the precise location of the September 2, 1998 crash is undetermined at this time, defendants stipulate for the purposes of this motion that the accident site is within the 12–mile territorial waters currently claimed by the Canadian federal government, but is outside the 3–mile limit of the territorial waters claimed by Canada at the time the U.S. Congress passed DOHSA in 1920.[2] Two-hundred fifteen passengers, primarily American, Canadian, Swiss, and French domiciliaries, and fourteen crew members were killed in the crash.

Lawsuits were filed on behalf of more than 140 decedent passengers on that flight in federal courts throughout the United States. The defendants include: Swissair, which controlled and operated the international flight; Delta, which ticketed many of the American passengers, pursuant to an operating agreement between the airlines; SAirGroup, the parent holding company for Swissair; McDonnell Douglas, which manufactured the airplane; and Boeing, which owns McDonnell Douglas and acts as its successor-in-interest. In addition, the plaintiffs allege that a primary cause of the crash was a fire sparked by a malfunction in the In–Flight Entertainment ("IFEN") System. This system provided passengers with gaming, shopping, individual movies, video programming, and other services. Plaintiffs also have sued Interactive Flight Technologies, Ltd. ("IFT"), which developed, designed, built components for, and marketed the IFEN system and entered into a contract with Swissair to equip the Swissair fleet with the system; Hollingsead International ("HI"), which performed the airplane/IFEN integration engineering and installation pursuant to a contract with IFT; Santa Barbara Aerospace ("SBA"), which, pursuant to a subcontract with HI, obtained the necessary certification from the Federal Aviation Administration ("FAA") for the installation of the IFEN system and reviewed test results for environmental testing of IFEN system components; and SR Technics, which, pursuant to a contract with Swissair, provided facilities, support, and oversight for the installation of the IFEN system, monitored the quality of the workmanship of the systems installed, and certified the aircraft as airworthy following installation of the IFEN system and prior to the return of the plane to service.[3] Plaintiffs have also sued Du-

---

**2.** Defendants' briefs do not address the significance, if any, of this distinction. They contend that DOHSA applies regardless of whether the accident occurred in foreign territorial waters or international waters. Canada extended its territorial sea from the three to the 12–mile mark from its shores in 1996. Oceans Act, S.C., part 1, ch. 31, § 4 (1996) (Can.); *cf.* Territorial Sea and Fishing Zones Act, R.S.C., ch. 22 (1964) (repealed 1996) (Can.) (three-mile territorial sea).

**3.** SR Technics, pursuant to a contract with Swissair, is responsible for ensuring the airworthiness, serviceability, and technical flight safety of the Swissair fleet. This includes, but is not limited to, responsibility for base maintenance, line maintenance, inspection, overhaul, alteration, and repair of aircraft, engines, and aircraft components. SR Technics, formerly known as Swissair Technical Services Ltd., is the former Department of Technical Services of Swissair, formed as a separate corporate entity and performing, by contract, the maintenance, service, and repairs that Swissair would be obligated to do on its own. SR Technics also is 100 % owned by SAirServices, which in turn is 100 % owned by SAirGroup.

Pont, the manufacturer of the metallized mylar used in the aircraft's insulation blankets, which, they theorize, permitted the rapid spread of the fire.

The federal court cases were transferred to this court for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407(a) since the cases involve common questions of fact. Pursuant to a joint agreement, Boeing and Swissair conceded liability for purposes of compensatory damages only and agreed to pay to any plaintiff full compensatory damages available under any law, foreign or domestic, that was determined applicable to a particular decedent in a particular case, provided the claim was limited to compensatory damages.

Cross-claims for contribution and indemnification were filed by and among the various defendants. Once the plaintiffs' claims for damages have been tried or settled, the defendants will resolve those issues among themselves or through trial.

Because the Canadian authorities are still investigating the crash and have not issued a final report of their findings, and to afford all parties a fair opportunity to attempt to settle claims amicably, the court stayed liability discovery pending resolution of the question whether DOHSA is the exclusive avenue for assertion of claims against defendants in actions brought in the courts of the United States. By its terms, DOHSA precludes recovery of punitive damages.

Defendants argue that DOHSA applies because the crash occurred on the high seas more than 12 nautical miles from United States shores and that it must be applied, at least, as to all U.S. domiciliary decedents.

Plaintiffs respond that DOHSA cannot apply because the crash occurred in Canadian territorial waters which, they contend, are not included in the internationally accepted scope of the term "high seas." They offer that for accidents occurring in foreign territorial waters general maritime law, in conjunction with state law, provides sufficient guidance as to appropriate legal remedies.

## III. DISCUSSION

*DOHSA*

As amended in 2000, DOHSA provides, in pertinent part:

> In the case of a commercial aviation accident, whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas 12 nautical miles or closer to the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, this chapter shall not apply and the rules applicable under Federal, State, and other appropriate law shall apply.

46 U.S.C. app. § 761(b).

The Amendment created a new cause of action for nonpecuniary damages.

> If the death resulted from a commercial aviation accident occurring on the high seas beyond 12 nautical miles from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, additional compensation for nonpecuniary damages for wrongful death of a decedent is recoverable. Punitive damages are not recoverable.

46 U.S.C. app. § 762(b)(1). Nonpecuniary damages are defined as damages for loss of care, comfort, and companionship. 46 U.S.C. app. § 762(b)(2).

The Amendment's application was retroactive and applicable to any death occur-

ring after July 16, 1996.[4] Pub.L. 106–181, Title IV, § 404(c) (Apr. 5, 2000). All parties agree that if DOHSA is applicable, then it applies as amended.

■ On its face, Amended DOHSA seems capable of supporting both plaintiffs' and defendants' arguments. If the term "high seas" is seen as waters to which no sovereign could lay a claim, then the plaintiffs' interpretation would indeed hold water. On the other hand, if the term "high seas" is viewed as encompassing all navigable sea waters "beyond 12 nautical miles from the shore" of the United States, then defendants' interpretation would be correct. This court concludes that, given the guidelines established for resolution of a nautical statute's meaning when its language is subject to differing readings, the latter reading, defendants', is the only plausible one.

### A. Principles of Maritime Statutory Interpretation

Under circumstances where the words of a nautical statute may not be susceptible to clear, plain reading, the United States Supreme Court has directed that a court define maritime terms of art according to their "established meaning" under the general maritime law existing at the time the Act was passed and in the case law to which Congress was then responding. *McDermott International Inc. v. Wilander*, 498 U.S. 337, 342, 354, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991).

■ Under generally accepted principles of international law, the navigable sea is divided into three zones: inland waters; territorial waters extending seaward from a defined coastal baseline; and the high seas, international waters beyond the limit of a sovereign's territorial sea. *United States v. Louisiana*, 394 U.S. 11, 22–23, 89 S.Ct. 773, 22 L.Ed.2d 44 (1969); *see generally* I. Brownlie, *Principles of Public International Law* at 183–84 (3d ed.1979); *Webster's New Collegiate Dictionary* (1979) (defining "high sea" as "the open part of a sea or ocean esp[ecially] outside territorial waters"). Despite this ostensibly established meaning under international law, a review of legislative history, *infra*, demonstrates that the proponents and opponents of the original DOHSA legislation employed substantively different definitions of the term, and it can be vigorously disputed whether Congress intended to incorporate into DOHSA the international concept of high seas as sovereignless waters.

■ Under *McDermott*, the first rule of construction of maritime statutes is that, in the absence of contrary indication, a court must assume that Congress intended a given term to have its "established meaning." 498 U.S. at 342, 111 S.Ct. 807. However, if there is a contrary indication—that is, some evidence that Congress did not intend a term to have its established meaning—a court must look to the definition that best explains existing case law and that is consistent with any known Congressional terminology distinctions. *Id.* at 354, 111 S.Ct. 807. For example, in justifying its definition for the term "seaman" under the Jones Act, the *McDermott* Court stated, "This rule best explains our case law and is consistent with the pre-Jones Act interpretation of 'seaman' and Congress' land-based/sea-based distinction." *Id.* See also *In re: Air Crash Off Long Island, New York, on July 17, 1996,* 209 F.3d 200, 203 (2d Cir.2000) (hereinafter *"TWA Flight 800"*) (noting that the Supreme Court interpreted the word "seaman" in the Jones Act with reference to the Supreme Court decisions to which

---

4. July 16, 1996 is the day before the TWA Flight 800 crash.

Congress was responding when it passed that Act).

Applying *McDermott*, this court must examine whether "high seas" reflected an established meaning as understood by Congress when it enacted the statute in 1920. If no such established meaning existed, the court must then look to a definition that best explains existing case law and is consistent with any known Congressional terminology distinctions. 498 U.S. at 354, 111 S.Ct. 807.

Additionally, because DOHSA was amended in 2000, the principles of statutory interpretation applicable to amendments require this court to assume that when it amended DOHSA, Congress was aware of and intended to carry forth the effect given by the courts in interpreting "high seas" over the decades following DOHSA's original enactment.

 In amending a statute, Congress is presumed to know the federal courts' intervening interpretation of the statute it intends to amend. Where there is no indication that Congress intended to change the meaning courts have given to the statute, a court must presume that Congress did not intend a change. *Ankenbrandt v. Richards*, 504 U.S. 689, 700–01, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992) ("With respect to such a longstanding and well-known construction of the diversity statute, and where Congress made substantive changes to the statute in other respects, ..., we presume, absent any indication that Congress intended to alter this exception, ..., that Congress 'adopt[ed] that interpretation' when it reenacted the diversity statute."); *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 227, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957); *Iraola & CIA, S.A. v. Kimberly–Clark Corp.*, 232 F.3d 854, 859–60 (11th Cir. 2000). Courts must presume that Congress will use clear language if it intends

to alter an established understanding about what a law means; if Congress fails to do so, courts must presume that the new statute has the same effect as the older version. *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 988 (7th Cir.2001) (citing *Cottage Svgs. Ass'n v. Commissioner*, 499 U.S. 554, 562, 111 S.Ct. 1503, 113 L.Ed.2d 589 (1991); *NBD Bank, N.A. v. Bennett*, 67 F.3d 629, 632 (7th Cir.1995)).

██ Further, the Supreme Court has held that re-enactment of a statute which has been given a consistent judicial interpretation generally includes the settled judicial interpretation. *Pierce v. Underwood*, 487 U.S. 552, 567, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); *Lorillard v. Pons*, 434 U.S. 575, 580–81, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) (Congress in adopting a new law incorporating sections of a prior law normally can be presumed to have had knowledge of interpretation given to incorporated law.). From these cases is extracted the principle that when Congress amends an existing statute, a court must presume that any part of the statute left intact reflects Congress' intent to preserve the prevailing judicial interpretation of that portion.

### 1. The Less–than–Established Meaning of "High Seas" in DOHSA's Legislative History

DOSHA, 46 U.S.C. app. § 761, was enacted by Congress in 1920 to resolve the anomaly created by the Supreme Court's decision in *The Harrisburg*, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886). *See* S.Rep. No.216, 66th Cong., 1st Sess., 3, 4, (1919); H.R.Rep. No.674, 66th Cong., 2d Sess., 3, 4 (1920) (noting that the rule of that case had been rejected by "[e]very country of western Europe," and was a "disgrace to a civilized people"), *cited in TWA Flight 800*, 209 F.3d at 204; *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 397, 90 S.Ct.

1772, 26 L.Ed.2d 339 (1970). In *The Harrisburg,* a steamer collided with a schooner in waters between the coast of Massachusetts and the islands of Martha's Vineyard and Nantucket, killing the first officer of the schooner. *See id.* at 199–200, 7 S.Ct. 140. Because the decedent's widow and child did not bring suit within the applicable state statutes of limitations, they sought to recover under general maritime law. The Court held that, in absence of an applicable state statute, general federal maritime law did not provide a remedy in cases of wrongful death. The Court reasoned that since there was no common law remedy for wrongful death on land, there could be none at sea. *See id.* at 212–13, 7 S.Ct. 140.[5]

Supreme Court decisions subsequent to *The Harrisburg* mitigated the harshness of that holding by giving more expansive interpretations to state statutes that provided recovery for deaths occurring upon navigable waters, even on the high seas, beyond a state's territorial waters. In *The Hamilton,* 207 U.S. 398, 403, 28 S.Ct. 133, 52 L.Ed. 264 (1907), the Court held that a citizen of Delaware could bring suit in admiralty against another under Delaware's wrongful death statute, even though the death had occurred on the high seas, seven miles off the coast of Virginia. The Court reasoned that Delaware law defined the obligations of the parties, "even when personally on the high seas." *Id.* The tension between the holdings in *The Harrisburg* and *The Hamilton* "created jurisdictional fictions and serious problems in choice of law that sometimes denied recovery altogether." *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 235, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986)

(Powell, J., concurring in part and dissenting in part).

In response to the conflicting body of law stemming from these cases, the Maritime Law Association ("MLA") proposed to Congress a number of drafts of bills, one of which eventually became the Death on the High Seas Act. Congress' priority was to draft a statute allowing recovery for wrongful death on the high seas, H.R.Rep. No. 66–674, at 4 (1920); S.Rep. No. 66–216, at 4 (1919), and the MLA sought legislation that would achieve uniformity in maritime remedies and displace state statutory remedies, which were raising difficult choice of law issues. *See* H.R.Rep. No. 63–160, at 2 (1913); Robert M. Hughes, *Death Actions in Admiralty,* 31 Yale L.J. 115, 117 (1921) (cited in *TWA Flight 800,* 209 F.3d at 204). However, in response to opposition arising from concern for the preservation of state remedies, the MLA proposed a new bill in 1916 that "does not interfere with the law in force.... It simply covers waters that are not now covered." *Right of Action for Death on the High Seas: Hearing Before the Comm. On the Judiciary, Subcomm. No. 2,* 64th Cong., 1st Sess. 17 (Feb. 4, 1916) [1916 Hearing] *cited in TWA Flight 800,* 209 F.3d at 204.

From 1904 to 1911, the bills that had been proposed by the MLA would have applied to the high seas, the Great Lakes, and United States territorial waters and would also have included broad coverage of U.S. vessels in "whatsoever waters." H.R. 9880 (1904); H.R. 11486 (1906); H.R. 15810 (1909); S. 8397 (1909); S. 6291 (1910); S. 2673 (1911). In 1912, however, the "whatsoever waters" language was

---

**5.** It was not until 1970 that *The Harrisburg* was overruled. In *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 388, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), a unanimous Court recognized that a remedy existed for wrongful

death under general maritime law, based upon the "wholesale abandonment" of the prohibition on wrongful death actions on land in England and in the United States.

dropped from the proposed legislation, leaving for debate the remaining phrase, "on the high seas, the Great Lakes, or any navigable waters of the United States." H.R. 24764 (1912); S. 6930 (1912).

Plaintiffs point to a House hearing around 1912, at which a MLA attorney stated that the new proposal would not apply to foreign territorial waters. The attorney was asked whether text should be added to prevent suits for collisions "in foreign waters on foreign ships and under the jurisdiction of foreign countries." He replied, "No: we only say on the high seas, the Great Lakes, and other navigable waters of the United States. We leave out the territorial waters of foreign countries." *Actions for Death on the High Sea and Suits for Damages Caused by Government Vessels: House Comm. On the Judiciary,* 62d Cong. 10 (1912) (statement of Mr. Fitz–Henry Smith Jr., MLA Chairman).

In 1914, though, debate on the House floor among legislators strongly indicates that the meaning Congress intended for "high seas" did include foreign territorial waters. Congressman Bryan, an opponent of the 1913 bill,[6] criticized the expansive reach that the proponents' phrase "high seas" would give the draft bill, which he believed would even include the "high seas" waters of Puget Sound, a matter of considerable concern to his Washington constituency.[7] 52 Cong. Rec. app. 33–34 (1914). *But see Holtzman v. Schlesinger,* 414 U.S. 1304, 1313 n. 13, 94 S.Ct. 1, 38 L.Ed.2d 18 (1973) ("[I]t is well established that speeches by opponents of legislation are entitled to relatively little weight in determining the meaning of the Act in question."). Congressman Bryan's inter-

pretation of "high seas" was disputed by Congressmen supporting the proposed legislation. *See* 51 Cong. Rec. H1929 (1914) (statements of Reps. McCoy and Cox).

Congressman Bryan solicited an opinion from the U.S. Attorney General on the definition of "high seas" as used in the DOHSA draft. Assistant Attorney General Samuel Graham responded that "high seas" was defined variously, depending on the particular context, but that high seas begin "according to the American view, at low-water mark" and was defined by the Supreme Court as including "water on the seacoast without the boundaries of [the] low-water mark." February 13, 1914 Letter from Asst. Attorney General Samuel Gram to Hon. Bryan, *reprinted in* 52 Cong. Rec. app. 31, 34 (1914).

As a result of his dissatisfaction with the 1912 and 1913 bills, Congressman Bryan introduced his own bill, H.R. 12807, on February 2, 1914, proposing that the "high seas" be navigable waters seaward of the U.S. low-water mark, and that the maritime wrongful death statute should provide the exclusive remedy for death occurring on "any navigable water of the United States within the admiralty jurisdiction of the United States and out of the jurisdiction of any particular State." H.R. 12807, 63d Cong., 2d Sess. (1914) (stating in the record that "[a]ll of the Atlantic and Pacific Oceans are included in the high seas, but the State jurisdiction extends out 3 miles").

The majority in its opinion in *TWA Fight 800* addressed this aspect of the legislative history in some detail, and that discussion bears repeating here:

---

6. The Senate's 1913 bill is identical to the bill introduced in 1912. *Compare* S. 6930, 62d Cong. (1912) *with* S. 1661, 63d Cong. (1913).

7. *See* 14 Cong. Rec. 1929 (1914) (App. 121) ("Puget Sound is considered part of the high seas under the law. It is an arm of the sea.... I cannot see where the jurisdiction of the State court would be retained.")

In the 1914 congressional debates on DOHSA, conducted in the wake of litigation growing out of the Titanic disaster in 1912, objections arose that the bill would oust state jurisdiction over wrongful death and substitute an inadequate federal remedy. *See, e.g.,* 14 Cong. Rec. 1929 (Jan. 19, 1914) (statement of Rep. Bryan); id. at 1928 (statement of Rep. Mann). In response to opposition from members of Congress and local practitioners, the MLA abandoned its effort to draft a uniform remedy. Instead, it submitted a new bill in 1916 that "does not interfere with the law. in force.... It simply covers waters that are not now covered." *See* Right of Action for Death on the High Seas: Hearing Before the Committee on the Judiciary, Subcommittee No. 2, 64th Cong., 1st .Sess. 17 (Feb. 4, 1916) [1916 Hearing].

The 1916 version of DOHSA preserved state remedies in three significant ways: First, the drafters changed "any navigable waters of the United States" to "any navigable waters of the Panama Canal Zone, the District of Columbia, or the Territories or dependencies of the United States," eliminating DOHSA's reach over navigable waters within state jurisdiction: S. 4288, 64th Cong. § 1 (1917); H.R. 39, 65th Cong. § 1 (1917). Second, the drafters added a section, which became § 7 of DOHSA, that provided that the act would not affect state wrongful death remedies for deaths in state territorial waters. This provision also exempted the Great Lakes or "any waters within the territorial limits of any State" from DOHSA's scope. S. 4288, 64th Cong. § 6 (1917); H.R. 39, 65th Cong. § 6 (1917). Finally, the later drafts added the words "beyond a marine league" to § 1, so that the proposed act covered deaths "on the high seas beyond a marine league from the shore of any State." S.2085, 66th Cong. § 1 (1919); S. 4288, 64th Cong. § 6 (1917); H.R. 39, 65th Cong. § 1 (1917). This version of DOHSA was narrowed further when the Secretary of War requested that Congress avoid legislating in the Panama Canal Zone. *See* S.Rep. No. 66–216, at 5 (1919). The Panama Canal Zone reference was moved to § 7, which lists certain waters excluded from DOHSA's scope.

The statute that Congress passed in 1920 created a remedy for wrongful death "occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States." 46 U.S.C. app. § 761. 209 F.3d at 204–05.

United States Supreme Court case law as of 1920 when DOHSA was debated in Congress is similarly unhelpful regarding a consistent definition of "high seas." *Compare Ross v. McIntyre,* 140 U.S. 453, 471, 11 S.Ct. 897, 35 L.Ed. 581 (1891) ("The term 'high seas' includes waters on the seacoast without the boundaries of low-water mark"), *and United States v. Dewey,* 188 U.S. 254, 271, 23 S.Ct. 415, 47 L.Ed. 463 (1903) ("And the high seas include coast waters without the boundaries of low-water mark, though within bays or roadsteads, waters on which a court of admiralty has jurisdiction.") *with The Scotia,* 81 .U.S. 170, 179, 14 Wall. 170, 20 L.Ed. 822 (1871) ("The high seas are outside of the territory of municipal powers, and .their laws have no force there."), *The Scotland,* 105 U.S. 24, 29, 15 Otto 24, 26 L.Ed. 1001 . (1881) (describing the "high seas" as "where the law of no particular State has exclusive force, but all are equal"), *and The Hamilton,* 207 U.S. 398, 403, 28 S.Ct. 133, 52 L.Ed. 264 (1907) (characterizing the "high seas" as "outside the territory, in a place belonging to no other sovereign").

That the Congressional record is spotty and appears contradictory as to whether

Congress intended the term "high seas" to include foreign territorial waters is explained by the simple fact that the question of the extent of coverage beyond a marine league from the shores of the United States was, at most, of tangential concern. Congress' concern, second only to creating a uniform remedy for maritime disasters, was one of federalism, that is, preserving then existing state law remedies to the fullest reach of state territorial waters. H.R.Rep. No. 66–674, at 4 (1920); S.Rep. No. 66–216, at 4 (1919); 1916 Hearing, at 11–12 (statement of Robert M. Hughes) ("[The MLA committee] came to the conclusion that ... the simplest bill and the one that would cause the least opposition would be a bill to recognize the State statutes as governing on the territorial waters of the State, and to make our bill simply apply where no bill applies at all now—that is, a marine league from the shore."); *see also TWA Flight 800*, 209 F.3d at 216 (Sotomayor, J., dissenting) ("Simply stated, it is irrelevant whether Congress shared the international legal understanding of 'high seas' as 'non-sovereign waters,' because its only concern at the time of DOHSA's passage was state, and not federal boundaries."); *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 621, 98 S.Ct. 2010, 56 L.Ed.2d 581 ("[T]he reason Congress confined DOHSA to the high seas was to prevent the Act from abrogating, by its own force, the state remedies then available in state waters.").

In its final form, Section 1 of DOHSA provided:

> Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring *on the high seas beyond a marine league from the shore of any State*, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued.

46 U.S.C. § 761 (1920) (emphasis added).[8]

In April 2000, Section 1 was amended to resolve a discrepancy between Proclamation No. 5928, issued by President Ronald Reagan in 1988, which extended the United States territorial waters from three to twelve (12) nautical miles beyond the shore of any state. The scope of DOHSA had until that point been commensurate with the then-three-mile boundary of the United States' territorial sea.

The litigation flowing from the 1996 tragedy of TWA Flight 800 brought to light that it was not clear in view of the Proclamation whether the three-mile boundary ("beyond a marine league") specified in DOHSA was (1) the geographical expression of the political boundary of "high seas," that is, the extent of the federal territorial sea as it had been in 1920, subject to change according to the change in the federal definition of the territorial sea, or (2) a geographical boundary set by Congress primarily to preserve state actions in state territorial waters, and thus impervious to Executive Branch proclamations that pertain to the federal territorial seas.[9] The TWA Flight 800 crash occurred eight nautical miles off the coast of Long Island, a point outside the explicit scope stated in DOHSA, but within the Proclamation's twelve-nautical mile bound-

---

**8.** A marine league is equivalent to three nautical miles (nm).

**9.** The Commentary on the effect of the Proclamation did not provide guidance on this matter. As the Office of Legal Counsel of the United States Department of Justice explained, "The issue ... is whether Congress intended for the jurisdiction of any existing

ary of the territorial sea. The second circuit held that, for purposes of DOHSA, the term "high seas" meant those waters beyond the territorial waters of the United States, applying the Proclamation's 12–mile limit as a new implied geographical limit upon DOHSA's reach. Thus, DOHSA was ruled not to be applicable to Flight 800, since it crashed in United States territorial waters eight miles from the U.S. coast. 209 F.3d at 215. However, that decision purposely did not opine on the applicability or inapplicability of DOHSA to crashes occurring within foreign territorial waters. *See id.* at 212.[10]

### 2. Judicial Application of DOHSA to Foreign Territorial Waters

Having determined that contrary indication exists as to whether Congress intend-

ed the term "high seas" to have its established meaning, following *McDermott,* this court must now examine existing case law regarding DOHSA's application to foreign territorial waters.

Although DOHSA's language does not explicitly state that a death "beyond a marine league from the shore of any State" also includes deaths that occur within a marine league of the shore of any foreign nation, courts have consistently interpreted DOHSA as applying to nautical accidents that occur within such foreign territorial waters. *See Jennings v. Boeing Co.,* 660 F.Supp. 796 (E.D.Pa.1987), *aff'd without op.,* 838 F.2d 1206 (3d Cir.1988); *Howard v. Crystal Cruises, Inc.,* 41 F.3d 527, 529, 531 (9th Cir.1994) (finding that territorial waters of Mexico are "high

statute to include an expanded territorial sea. Thus the question is one of legislative intent." Douglas W. Kmiec, Office of Legal Counsel, *Legal Issues Raised by the Proposed Presidential Proclamation to Extend the Territorial Sea,* 1 Terr. Sea J. 1, 22 (1990) (hereinafter "OLC Opinion").

10. The majority in *TWA Flight 800* interpreted the Proclamation as a political change in the United States' border of the high seas for domestic, as well as international, purposes. 209 F.3d at 213 ("Nothing in DOHSA's history or purpose provides a persuasive reason to fix immutably the scope of the statute to the boundary between United States territorial waters and nonterritorial waters as it existed in 1920. Thus, plaintiffs are correct in concluding that the effect of the Proclamation is to move the starting point of the application of DOHSA from three to 12 [nautical] miles from the coast.") In other words, DOHSA's language, "on the high seas beyond a marine league," is conjunctive; in order to maintain an action under DOHSA, the majority found, an accident must have occurred both on the high seas *and* a marine league from the shore of any State. Thus, because the court found that the Proclamation changed the international boundary of the high seas, "high seas" and "marine league" were no longer coterminous, as they had been when DOHSA was

enacted in 1920. As a result, the court held that the TWA crash site, eight nautical miles off the coast of Long Island, fell within the scope of the Proclamation and thus outside the scope of DOHSA.

The dissent disagreed, interpreting the Proclamation as affecting U.S. boundaries only with respect to international law. The dissent arrived at this interpretation by examining the analysis of the courts that have applied DOHSA to foreign territorial waters and consistently have held that a death within the territorial waters of a foreign state occurs on the "high seas" for purposes of DOHSA. *Id.* at 221 (foreign territorial waters cases discussed *infra,* next section). "[T]hese [foreign territorial waters] authorities cannot be reconciled with a holding that the DOHSA Congress intended to incorporate into the Act the international legal concept of the high seas as non-sovereign waters." *Id.* Further, the dissent considered the scope of the Proclamation irrelevant for purposes of DOHSA interpretation, since all sources of Congressional intent indicate that DOHSA was enacted to preserve state, not federal, sovereignty. *Id.* at 222–23 ("I have found no justification in the legislative history, and the majority has pointed to none, for carving out the three nautical mile zone other than to preserve state remedies. . . .").

seas" under the Act); *Azzopardi v. Ocean Drilling & Exploration Co.,* 742 F.2d 890, 892, 894 (5th Cir.1984) (English Channel is "high seas"); *Sanchez v. Loffland Bros.,* 626 F.2d 1228, 1230 n. 4 (5th Cir.1980), *reh'g denied,* 636 F.2d 315 (5th Cir.), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 974 (1981) (Lake Maracaibo, Venezuela); *Kuntz v. Windjammer "Barefoot" Cruises, Ltd.,* 573 F.Supp. 1277, 1280–81 (W.D.Pa.1983), *aff'd,* 738 F.2d 423 (3d Cir. 1984) (scuba diving off Berry Islands, Bahamas); *In re Air Crash Disaster Near Bombay, India on Jan. 1, 1978,* 531 F.Supp. 1175, 1184 (W.D.Wash.1982) (Indian territorial waters, and stating, "Nothing in the Death on the High Seas Act or its legislative history supports the position that Congress intended to limit the scope of this remedy to deaths occurring in international waters."); *First & Merchants Nat'l Bank v. Adams,* 1979 A.M.C. 2860 (E.D.Va.1979), *aff'd in part, rev'd in part on other grounds,* 644 F.2d 878 (4th Cir. 1981) (Canadian territorial waters); *Moyer v. Klosters Rederi,* 645 F.Supp. 620 (S.D.Fla.1986) (Jamaican waters); *Cormier v. Williams/Sedco/Horn Constructors,* 460 F.Supp. 1010 (E.D.La.1978) (navigable river in Peru); *Hammill v. Olympic Airways, S.A.,* 398 F.Supp. 829 (D.D.C.1975) (Greek coastal waters); *see also* 2 Benedict on Admiralty ch. VII § 81 n. 18 ("It appears to be settled that the term 'high seas' within the meaning of DOHSA is not limited to international waters, but includes the territorial waters of a foreign nation as long as they are more than a marine league away from any United States shore.") [11]

*Jennings,* decided in this district court, involved a wrongful death action stemming from a helicopter crash in the North Sea approximately 2.5 miles off the Shetland Islands, Scotland, i.e., in Scottish territorial waters. In finding that DOHSA applied to the case, the court noted,

> By its own terms [DOHSA] applies to deaths occurring on the high seas. From this broad geographic area, an exception of sorts is carved out; the act is only applicable to deaths on the high seas "beyond a marine league from the shore of any State" of the United States. Clearly if Congress had been using the term "high seas" in the generally accepted international sense, there would have been no need to carve out that exception. The territorial waters extended from the coastal states a distance of a marine league are not included within the classic definition of "high seas." *See In re Air Crash Near Bombay,* 531 F.Supp. at 1183. It is proper, therefore, to infer that the term high seas was used to refer to all waters beyond the United States coast, otherwise the phrase "beyond a marine league" would be superfluous.

660 F.Supp. at 803.

Similarly, the ninth circuit, in *Howard,* found that DOHSA was the exclusive remedy for the wrongful death action of the wife of a cruise passenger who died from complications of an injury incurred while disembarking from a vessel in Mexico. 41 F.3d at 529–30 (citing 2 Ellen M. Flynn, et al., *Benedict on Admiralty,* § 81c, at 7–11 n. 20 (7th ed.1993)) (additional citations omitted). After listing the many cases that applied DOHSA to foreign territorial waters, the *Howard* court concluded that "there is nothing inherently absurd with the notion of an American court applying American law to an action filed by an

---

**11.** The court notes, however, that whether DOHSA applies to accidents that occur in foreign territorial waters in light of the 2000 Amendment is a case of first impression in this district, and in all circuits.

American plaintiff against an American defendant, particularly when the law in question was expressly designed to cover wrongful deaths occurring outside the boundaries of the United States." 41 F.3d at 530.

Although decided prior to *McDermott*, the aforementioned foreign territorial waters cases applied analyses wholly consistent with the present requirements of the Supreme Court in *McDermott*. For example, in trying to reconcile the interplay between the phrases "high seas" and "beyond a marine league," the *Jennings* court reasoned that defining "high seas" in the "generally accepted international sense" would make the phrase "beyond a marine league" "superfluous." 660 F.Supp. at 803. In the face of this contrary indication, the court found it "proper, therefore, to infer that the term high seas was used to refer to all waters beyond the United States coast." *Id.* In so finding, the court noted that this construction of the statute was consistent with Congress'· underlying purpose, to develop a uniform ·effective federal maritime tort action for wrongful death, while at the same time taking care to preserve existing state remedies. *Id.*

Similar reasoning has been consistently employed by courts in cases applying DOHSA to foreign territorial waters. *See, e.g., Howard*, 41 F.3d at 529 (finding that because the statute does not speak directly to application in foreign territorial waters, "we must answer the question of whether something that happens within the territorial waters of a foreign state occurs on the 'high seas' for purposes of DOHSA.") (cit-

ing · *Offshore Logistics v. Tallentire*, 477 U.S. 207, 232–33, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986)); *Moyer*, 645 F.Supp. at 623 ("With respect to the applicability of DOHSA to ·an incident occurring in waters directly offshore at Cozumel, a look at the relevant statutory ·language fails to provide clear guidance."). ·

### 3. Applying Principles of Statutory Interpretation to .the Amendment

Defendants argue that DOHSA's new language, "on the high seas 12 nautical miles *or closer* to the shore," 761(b) (emphasis added), demonstrates that the term "high seas" in DOHSA is not used in the international sense, but is to be given a geographical ·meaning, since it contemplates waters 12 nms or closer to the shore as being high seas, despite President Reagan's proclaiming them to be territorial seas. (Ds' Repl. Br. at 4.) ·

Plaintiffs assert that the amended DOHSA paralleled the *TWA Flight 800* holding, and, in so doing, Congress intended to adopt the definition of "high seas" adopted by the majority in that opinion, which, they argue, includes only international, nonsovereign waters. *See TWA Flight 800*, 209 F.3d at 205–07.[12] Plaintiffs contend that the amendment did not redefine the central term "high seas," and [what plaintiffs argue was] left untouched was the intent of DOHSA's original drafters to apply the statute only to international nonterritorial waters. Plaintiffs also point out that in *TWA Flight 800*, the second circuit applied *McDermott*'s holding that statuto-

---

**12.** Further, it is also important to note that while the amendment Congress ultimately enacted extended the federal territorial sea for purposes of DOHSA, the impetus to legislate stemmed not from the *TWA Flight 800* decision but from the tragedy itself, as evidenced by the fact that Congressional resolutions on the issue of amending DOHSA were debated as early as 1997, three years before the case was decided. *See, e.g.,* H.R.Rep. No. 105–201, *Nonapplicability of Death on the High Seas Act to Aviation Incidents* (1997); H.R.Rep. No. 106–32, *To Clarify the Application of the Act Popularly Known as the "Death on the High Seas Act" to Aviation Incidents* (1999).

ry maritime terms of art must be interpreted according to the case law to which Congress was responding when enacting the statute. 498 U.S. at 342, 354, 111 S.Ct. 807. The *TWA Flight 800* court did review the definition of "high seas" in pre-DOHSA Supreme Court cases, as well as the statute's legislative history, in determining its meaning. The court concluded that the cases *The Scotland*, 105 U.S. 24, 29, 15 Otto 24, 26 L.Ed. 1001 (1881); *Deslions v. La Bourgogne*, 210 U.S. 95, 115, 28 S.Ct. 664, 52 L.Ed. 973 (1908); *The Hamilton*, 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264 (1907); and *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 355, 29 S.Ct. 511, 53 L.Ed. 826 (1909), defined "high seas" "to mean international or nonsovereign waters...." 209 F.3d at 205. The *TWA Flight 800* court also stated, however, that "the Court has not provided a consistent definition of 'high seas' throughout the past two centuries." *Id.* at 206.

Without regard to whether the *TWA Flight 800* majority's pre-DOHSA view is correct as to the possible meaning of "high seas" when DOHSA was enacted in 1920, this court has to look at the case law that developed after DOHSA was enacted through the time of the 2000 amendment. That case law has interpreted DOHSA consistently as applying to deaths occurring within foreign territorial waters. A court must assume that, when faced with the task of amending DOHSA, Congress was well aware of the large body of federal case law that had applied the Act to aviation accidents occurring on foreign territorial waters. *See Ankenbrandt, supra*, 504 U.S. at 700–01, 112 S.Ct. 2206; *Fourco Glass, supra*, 353 U.S. at 227, 77 S.Ct. 787; *Iraola, supra*, 232 F.3d at 859–60; *Cottage Svgs., supra*, 499 U.S. at 562, 111 S.Ct. 1503; *Pierce, supra*, 487 U.S. at 567, 108

S.Ct. 2541; *Lorillard, supra*, 434 U.S. at 580–81, 98 S.Ct. 866.

As is evidenced by its legislative history, Congress was chiefly concerned in the amendment process with the Supreme Court decision, *Zicherman v. Korean Air Lines*, 516 U.S. 217, 230, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996), which held that plaintiffs could not recover loss of society damages under DOHSA, whereas plaintiffs, whose decedents died in an aviation accident over land, could. The report stated, *inter alia:*

> The effect of this decision is to treat families differently depending on whether their relative died in an aircraft that crashed into the ocean or one that crashed into land. If the plane crashes into the ocean, DOHSA applies and the family is entitled only to pecuniary damages. However if a plane crashes into the land or close to land, the applicable tort law would apply. These generally permit the award of non-pecuniary damages such as loss of companionship.

> Given the nature and speed of air travel, it is often a matter of happenstance as to where an aircraft crashes. The result is that a family's rights under the law depend on pure chance....

> The Supreme Court recognized the inequity of this result and stated [in *Zicherman*, 516 U.S. at 229, 116 S.Ct. 629,] that "Congress may choose to enact special provisions applicable to Warsaw convention cases, as some countries have done." The reported bill (H.R.603) would do this and in such a way as to ensure that all families would be treated the same regardless of where a plane happened to crash.

H.R. Rep. 106–32 (Shuster Report on H.R. 603, February 24, 1999).[13] It is clear from

---

**13.** The court notes that the House Resolution

for which this report was submitted, to elimi-

this report, which distinguishes only "land" and "close to land" from "ocean," that Congress was not concerned with any problem arising from aviation accidents occurring in foreign territorial waters. Instead, Congress was intent upon fashioning a uniform remedy "regardless of where a plane happened to crash," focusing upon remedying the disparity between DOHSA actions, which did not allow non-pecuniary damages, and actions under state and general maritime law, which did.

The following summary was submitted on the Senate floor regarding a conference report including the resolution that was later adopted as the amendment to DOHSA:

## DOHSA

The territorial sea for aviation accidents is extended from 3 nautical miles to 12 nautical miles. The affect [sic] of this is that DOHSA will not apply to planes that crash into the ocean within 12 miles *from the shore of the U.S.* The law governing accidents that occur between a[sic] 3 nautical miles and 12 nautical miles from land will be the same as those that now occur less than 3 nautical miles from the land.

For those aviation accidents that occur more than 12 miles form [sic] land, the DOHSA will continue to apply. However, in those cases, the Act is modified as in the Senate bill except that there is no $750,000 cap on damages.

146 Cong. Rec. S25, 1249 (March 8, 2000). It is clear from the language above, as well as the amended statute itself, that Congress was concerned with extending the nautical miles beyond the United States coastline to which DOHSA would not apply, to permit state law recoveries to the fullest extent of the Proclamation, and that

it did not address. DOHSA's application to foreign territorial waters.

While the parties here have submitted extensive exhibits on the matter of Congressional intent, no party has cited a portion of the congressional record to stand for the proposition that Congress intended to modify DOHSA with respect to foreign territorial waters, nor has this court's research found such indication. Further, no evidence has been submitted that Congress did not possess an awareness of existing case law—that is, an awareness of the virtual consensus of district and circuit courts that DOHSA applies to foreign territorial waters.

While both the majority and dissenting opinions in *TWA Flight 800* provide an excellent review of DOHSA's legislative history, from which this court has borrowed generously, the legal analysis applied there is inapposite. As the majority opinion noted, it did not address the issue of whether DOHSA applies to foreign territorial waters. "We take no position on what courts should do when faced with the difficult question of whether to apply DOHSA in foreign territorial waters, where plaintiffs might otherwise be left with only foreign remedies in foreign courts." 209 F.3d at 212. Although the dissent discussed the long line of foreign territorial waters cases that had applied DOHSA, it did so with an eye towards justifying its conclusion that TWA Flight 800 crashed on the high seas for purposes of DOHSA. *Id.* at 221 ("[T]hese [foreign territorial waters] authorities cannot be reconciled with a holding that the DOHSA Congress intended to incorporate into the Act the international legal concept of the high seas as non-sovereign waters."). Its reference to foreign territorial waters was an illustration of its interpretation of the

nate DOHSA's application to aviation inci-

dents entirely, was ultimately rejected.

Act and was not an attempt to justify DOHSA's application to foreign territorial waters. The dissenting opinion merely attempted to show that the DOHSA framers had intended to preserve federal as well as state sovereignty in jurisdiction over death claims.[14] The *TWA Flight 800* decision is limited to whether DOHSA applied to domestic waters between three and 12 miles from the shores of the United States. On the other hand, this court is faced with deciding whether Congress intended DOHSA as amended to apply to foreign territorial waters.

### B. Principles of Uniformity in the Absence of a Clear Alternative Remedy

While the legislative history as to DOHSA's application in foreign territorial waters may be muddy, one thing is clear— Congress strove to provide a sure, uniform remedy in U.S. courts for survivors of decedents killed tortiously at sea, where none existed or where one might not exist. This has recently been reiterated. In determining that an action under DOHSA precludes a wrongful death action under domestic state law, the Supreme Court, in *Offshore Logistics v. Tallentire*, 477 U.S. 207, 227–32, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986), explored the importance of uniformity in fashioning a remedy, both in terms of observing Congressional intent as well as preserving judicial time and resources.

> As we have previously recognized, Congress acted in 1920 to remedy "[t]he void that existed in maritime law up and until 1920[:] the absence of any remedy for wrongful death on the high seas," and to achieve uniformity in the provision of such a remedy. [*Moragne*, 398 U.S. at 398, 90 S.Ct. 1772]. To read § 7

as intended to preserve intact largely nonexistent or ineffective state law remedies for wrongful death on the high seas would, of course, be incongruous. Just as incongruous is the idea that a Congress seeking uniformity in maritime law would intend to allow widely divergent state law wrongful death statutes to be applied on the high seas. *See, e.g.,* Putnam, The Remedy for Death at Sea, 22 Case & Com., at 125–127 (use of state wrongful death statutes "leaves the courts obliged to struggle with state statutes quite divergent in their terms, so that the resulting congeries of modes of remedy on navigable waters show a striking intricacy, leading to marked inefficiency"). *See also* [*Mobil Oil*, 436 U.S. at 625, 98 S.Ct. 2010] ("Congress did not limit DOHSA beneficiaries to recovery of their pecuniary losses in order to encourage the creation of nonpecuniary supplements," citing as authority *Wilson v. Transocean Airlines*, [121 F.Supp. 85 (N.D.Cal.1954)] (§ 7 does not preserve the operation of state wrongful death statutes on the high seas)). Indeed, it is hardly conceivable that Congress could have intended that these diverse state statutes could be applied to remedy maritime torts occurring the world over.

477 U.S. at 230, 106 S.Ct. 2485.

This court recognizes that the SwissAir cases differ from *Tallentire*. There, it was beyond dispute that DOHSA was applicable law. The issue had been whether the DOHSA action could be supplemented by state law. However, the overriding principles of DOHSA uniformity and exclusivity recognized in *Tallentire* apply here as well.

---

**14.** As the *TWA Flight 800* dissenting opinion notes, the DOHSA Congress could not have been concerned with preserving federal remedies because there was no preexisting federal remedy for deaths occurring on the high seas. *See* 209 F.3d at 222–23.

As pointed out in *Jennings*, because Congress only has the power to determine the boundaries of the territorial seas of the United States, and not the extent of the territorial seas of other nations, it may indeed have been Congress' understanding that DOHSA would have to apply in foreign territorial waters to protect the interests of its citizens to have a predictable remedy for their loss. "Because it was generally understood that the wrongful death statutes of the coastal states were not meant to apply to the high seas, including the territorial waters of foreign states, there was no need to limit further the scope of DOHSA's application." *Jennings*, 660 F.Supp. at 803 (citing *Moragne*, 398 U.S. at 393 n. 10, 90 S.Ct. 1772); *see also Roberts v. United States*, 498 F.2d 520, 524 n. 7 (9th Cir.1974) (declining to decide the issue, but noting, "Because Congress only has power to fix the extent of territorial waters measured from the shores of its own country it may well have considered all waters beyond one marine league from those shores to be 'high seas' for purposes of DOHSA so long as navigable, even though within the territorial waters of a foreign state.").

### IV. CONCLUSION

For the foregoing reasons, this court finds that DOHSA, as amended, applies to aviation incidents in foreign territorial waters. Because Amended DOHSA does not allow recovery for punitive damages, 46 U.S.C. app. § 762(b)(1), defendants' motion to dismiss all claims for punitive damages under United States law is granted.

An appropriate order follows.

### *ORDER*

AND NOW, this ___ day of February 2002, upon consideration of Defendants' Motion to Dismiss Claims for Punitive Damages, on the ground that such claims are precluded by the Death on the High Seas by Wrongful Act, as amended, 46 U.S.C. app. §§ 761–767, for the reasons outlined in the attached memorandum, it is hereby ORDERED that the Defendants' Motion is GRANTED. Accordingly, all claims for punitive damages asserted against Defendants are hereby DISMISSED WITH PREJUDICE.