**STATE of Alaska, Petitioner,**

v.

**Vernon G. JACK, V, Respondent.**

**No. A–8062.**

Court of Appeals of Alaska.

April 11, 2003.

W.H. Hawley, Jr., Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Petitioner.

Margi A. Mock, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Respondent.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

### OPINION

STEWART, Judge.

On May 12, 2001, the Alaska state ferry Matanuska was navigating the Inside Passage on a voyage from Bellingham, Washington, to Southeast Alaska. According to the grand jury's indictment, while the Matanuska cruised through Canadian territorial waters, Vernon G. Jack, V, engaged in sexual contact and sexual penetration with S.N.F. and physically assaulted her. An Alaska State Trooper who happened to be aboard the Matanuska investigated Jack's conduct and arrested him. The grand jury in Ketchikan charged Jack with one count of first-degree sexual assault, one count of second-degree sexual assault, and four counts of fourth-degree assault for his misconduct aboard the Matanuska while it was in Canadian territorial waters.[1]

Superior Court Judge Larry R. Weeks granted Jack's motion to dismiss the indictment based on the State's lack of jurisdiction to prosecute Jack. We granted the State's petition for review. Because we conclude that the State's criminal jurisdiction did not extend to Canadian territorial waters, we affirm the superior court.

Under common law, a state has jurisdiction to prosecute those crimes occurring within its territorial limits.[2] And a state, by statute, may extend its jurisdiction to enforce violations of its substantive criminal law when a person's conduct occurring outside the territorial limits of the state affects an in-state interest.[3]

We discussed Alaska's statutory extension of criminal jurisdiction under AS 12.05.010 in *Wheat v. State*.[4] That statute provides:

When the commission of a crime commenced outside the state is consummated inside the state, the defendant is liable to punishment in this state even though out of the state at the time of the commission of the crime charged, if the defendant consummated the crime through the intervention of an innocent or guilty agent, or by other means proceeding directly from the defendant.

Wheat kept his daughter in Arizona after his visitation under an Alaska child custody order ended.[5] The State charged Wheat with second-degree custodial interference.[6] Wheat argued that Alaska could not prosecute him for this crime because his conduct occurred outside the State of Alaska.[7] We

---

1. AS 11.41.410(a)(1), AS 11.41.420(a)(1), and AS 11.41.230(a), respectively.

2. *See* Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* at 38–45 (3rd ed.1982); 1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 2.7 at 160–63, 2.9(a) at 180–86 (1986).

3. *See* Perkins & Boyce, *Criminal Law* at 41–42; LaFave & Scott, *Substantive Criminal Law* § 2.9(b) at 186–90.

4. 734 P.2d 1007 (Alaska App.1987).

5. *Id.* at 1007–08.

6. AS 11.41.330(a).

7. *See Wheat,* 734 P.2d at 1007–08.

reasoned that the results of Wheat's crime, withholding his child from her lawful custodian who resided in Alaska, occurred in Alaska.[8] Therefore, we concluded that the crime was consummated in Alaska and that the State properly prosecuted Wheat.[9]

■ In this case, the State has made no claim that Alaska has jurisdiction to prosecute Jack under AS 12.05.010 because Jack's misconduct and the results of his misconduct all occurred in Canadian territorial waters. Thus, the State must have another basis for prosecuting Jack for a violation of Alaska criminal law.

The State claims it has this power under AS 44.03.010. Alaska Statute 44.03.010 provides:

The jurisdiction of the state extends to water offshore from the coast of the state as follows:

(1) the marginal sea to its outermost limits as those limits are from time to time defined or recognized by the United States of America by international treaty or otherwise;

(2) the high seas to the extent that jurisdiction is claimed by the United States of America, or to the extent recognized by the usages and customs of international law or by agreement to which the United States of America or the state is a party;

(3) submerged land including the subsurface of submerged land, lying under the water mentioned in this section.

We considered this statute in *Corbin v. State*,[10] where a jury had convicted Corbin of stealing crab pots in the crab fishery more than sixteen miles offshore of Alaska.[11] Corbin argued that the State had no jurisdiction to prosecute him for this theft because the federal government had exclusive jurisdiction

in offshore waters beyond three miles and had preempted state regulation of offshore theft by enacting a theft statute that applied in the special maritime jurisdiction of the United States.[12] For purposes of his case, Corbin conceded that, on its face, AS 44.03.010 extended Alaska criminal jurisdiction to offshore waters.[13]

In *Corbin*, we relied in part on the Alaska Supreme Court's decision *State v. Bundrant*.[14] The *Bundrant* court ruled that the federal government had not preempted state regulation of the crab fishery offshore of Alaska, and that Alaska could therefore extend its jurisdiction beyond its territorial boundary in order to effect conservation of the fishery within state waters.[15] The court concluded that "a sufficiently close connection to legitimate state interests [had] been established to validate the state's limited efforts to regulate this resource."[16] In *Corbin*, we applied *Bundrant* and concluded that the enforcement of the Alaska theft statute to a crab-pot theft occurring in offshore waters "was so closely tied to the regulation of the crabbing industry that state jurisdiction in this case is justified."[17] However, in Corbin's case, we did not rule whether AS 44.03.010 extended Alaska's jurisdiction into Canadian territorial waters.

Alaska Statute 44.03.010 provides generally that the jurisdiction of the State extends to "waters offshore from the coast of the state" and describes specifically the area claimed by the state. To properly interpret whether AS 44.03.010 grants Alaska jurisdiction over Canadian territorial waters we must discuss a coastal state's authority over offshore waters.

In *United States v. California*,[18] the Supreme Court held that a coastal state had no

8. *Id.* at 1010–11.

9. *Id.* at 1011–12.

10. 672 P.2d 156 (Alaska App.1983).

11. *Id.* at 157.

12. *Id.*

13. *Id.*

14. 546 P.2d 530 (Alaska), *appeal dismissed sub nom, Uri v. Alaska*, 429 U.S. 806, 97 S.Ct. 40, 50 L.Ed.2d 66 (1976).

15. *Id.* at 544–48, 552–54.

16. *Id.* at 554.

17. *Corbin*, 672 P.2d at 158.

18. 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947).

authority over submerged lands in the territorial or marginal sea beyond the mean low water mark.[19] In 1953, Congress responded by enacting the Submerged Lands Act, which "recognized, confirmed, established, and vested in and assigned to the respective States" title to submerged lands under the marginal sea.[20] During the same session, Congress also passed the Outer Continental Shelf Lands Act (OCSLA).[21] Section 1332 of the OCSLA reads in part:

> (a) It is hereby declared to be the policy of the United States that (1) the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in this subchapter; (2) this subchapter shall be construed in such manner that the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected[.]

■ Under international law, the United States has authority over the sea adjacent to its coastline.[22] In Section 2 of the Alaska Statehood Act, Congress provided that the State of Alaska included all of the territory, "together with the territorial waters appurtenant thereto[.]"[23] This grant is mirrored by Article 12, Section 1 of the Alaska Constitution, which provides that the boundaries of the State include "the territorial waters appurtenant thereto[.]"[24] As the Alaska Supreme Court observed in *Metlakatla Indian Community v. Egan*,[25] the legislature passed AS 44.03.010 to extend Alaska's seaward boundaries to include the marginal sea, the high seas, and the submerged lands to the extent permitted by the federal government.[26]

Again, AS 44.03.010 provides that the jurisdiction of the state extends to "waters offshore of the coast of the state" and then specifies the three categories included: (1) the marginal sea, (2) the high seas to the extent claimed by the United States or recognized by international law, and (3) the submerged land under the first two defined categories. Jurisdiction would not be possible in this case under clause (1) because, as the superior court found, Jack's misconduct occurred entirely in Canadian territorial waters.

The State argues that Alaska has jurisdiction under clause (2) because the State interprets "high seas" in clause (2) to include all the ocean offshore of Alaska up to the low-water mark of all countries. But this interpretation is far too broad, and ignores the statute's initial limitation to "waters offshore the coast." The State provides no authority that would support a conclusion that the United States is empowered to regulate foreign territorial waters under either its power to regulate "Piracies and Felonies committed on the high seas,"[27] or the federal government's special admiralty and maritime jurisdiction.[28]

Under its admiralty and maritime jurisdiction, the United States may define and punish crimes committed by its citizens on U.S.-flagged vessels (such as the Matanuska) operating in foreign territorial waters.[29] Based on this special jurisdiction, the State argues that Alaska has jurisdiction under AS 44.03.010 to prosecute Jack's misconduct committed on an Alaskan vessel in Canadian territorial waters. However, the United States' authority over its flagged vessels

**19.** *Id.* at 39, 67 S.Ct. at 1668.

**20.** 43 U.S.C. § 1311(a).

**21.** 43 U.S.C. §§ 1331–43.

**22.** *See* Restatement (Third) of Foreign Relations Law § 511 (1987).

**23.** Pub.L. No. 85–508, 72 Stat. 339 (1958).

**24.** Alaska Const. art. 12, § 1.

**25.** 362 P.2d 901 (Alaska 1961), *vacated on other grounds*, 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d

562, *aff'd, Kake v. Egan*, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962).

**26.** *Id.* at 926.

**27.** U.S. Constitution, art. I, § 8, cl. 10.

**28.** U.S. Constitution, art. III, § 2, cl. 1.

**29.** *See United States v. Rodgers*, 150 U.S. 249, 266, 14 S.Ct. 109, 116, 37 L.Ed. 1071 (1893); *United States v. Flores*, 289 U.S. 137, 153, 53 S.Ct. 580, 584, 77 L.Ed. 1086 (1933).

while they are in foreign territorial waters is not exclusive—the coastal state has a concurrent interest in regulating the conduct aboard vessels within its territorial waters.[30] In other words, the fact that the United States has criminal jurisdiction over its flagged vessels does not preclude Canada from exercising its own jurisdiction when conduct aboard the vessel affects Canada's "peace, dignity or tranquility."[31] And even if the United States had jurisdiction over the vessel while it was in Canada's territorial waters, it does not follow that Alaska has the same jurisdiction, because nothing in AS 44.03.010 indicates that the legislature intended to assert jurisdiction over an Alaskan vessel operating outside the territorial waters specifically described in the statute.

We conclude that AS 44.03.010 does not extend state criminal jurisdiction into Canadian territorial waters.

*Conclusion*

The judgment of the superior court is AFFIRMED.

COATS, Chief Judge, concurring.

This case was very difficult for me because it seems obvious that the State should have jurisdiction. Jack concedes that the State has a sufficient interest in this case to allow the exercise of state jurisdiction. The alleged assault and sexual assault took place on an Alaska state ferry and the assaults were committed against an Alaskan resident. Jack's claim is that the legislature did not authorize the exercise of state jurisdiction.

Whether the legislature intended to extend its potential jurisdiction over this case is

governed by AS 44.03.010(2). That statute reads as follows:

> The jurisdiction of the state extends to water offshore from the coast of the state as follows:
>
> . . . .
>
> (2) The high seas to the extent that jurisdiction is claimed by the United States of America or to the extent recognized by the usages and customs of international law or by agreement to which the United States of America or the state is a party.

The State argues that we should give this language a broad interpretation, which would allow the State to exercise jurisdiction anywhere on the high seas where the United States of America could exercise jurisdiction if the State of Alaska has demonstrated a sufficient interest to overcome constitutional objections. Under this interpretation of the statute, the legislature in AS 44.03.010(2) expressed its desire to extend its criminal jurisdiction to all offenses that occur offshore from the coast of the state. The only limitation would be that the State could not exercise jurisdiction where the United States of America would not have jurisdiction or where the offense would have insufficient contacts with the state so that it would be unconstitutional for the state to exercise jurisdiction.

The language of AS 44.03.010(2) could support such an interpretation. Subsection two extends jurisdiction to "the high seas to the extent that jurisdiction is claimed by the United States of America. . . ." There is support for the argument that the high seas, as understood at the time the statute was passed, begin where territorial waters end.[1]

---

**30.** *See* Restatement (Third) Foreign Relations Law §§ 502(2), 512; *see also Wildenhus's Case*, 120 U.S. 1, 12, 7 S.Ct. 385, 387, 30 L.Ed. 565 (1887).

**31.** *Rodgers*, 150 U.S. at 261, 14 S.Ct. at 113.

**1.** *See, e.g., Maul v. United States*, 274 U.S. 501, 511, 47 S.Ct. 735, 739, 71 L.Ed. 1171 (1927) (stating that the "high seas" are "common to all nations and foreign to none"); *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 123, 43 S.Ct. 504, 507, 67 L.Ed. 894 (1923) (stating that on the "high seas" "there is no territorial sovereign"); *Am. Banana Co. v. United Fruit Co.*, 213 U.S. 347, 355, 29 S.Ct. 511, 512, 53 L.Ed. 826 (1909) (defining

"high seas" as a region "subject to no sovereign"); *Deslions v. La Compagnie Generale Transatlantique*, 210 U.S. 95, 115, 28 S.Ct. 664, 670, 52 L.Ed. 973 (1908) (using the definition of the high seas from *The Scotland* court); *Old Dominion S.S. Co. v. Gilmore*, 207 U.S. 398, 403, 28 S.Ct. 133, 134, 52 L.Ed. 264 (1907) (defining "high seas" as an area "outside the territory, in a place belonging to no other sovereign"); *The Scotland*, 105 U.S. 24, 29, 26 L.Ed. 1001 (1881) (defining "high seas" as those waters "where the law of no particular State has exclusive force, but all are equal"); *see also United States v. Romero–Galue*, 757 F.2d 1147, 1149 n. 1 (11th Cir.1985) (concluding that the "high seas" "lie seaward of a nation's territorial sea, which is the

Indeed, this definition is consistent with the definition used by the 1958 Geneva Convention on the High Seas, which defined the "high seas" as "all parts of the sea that are not included in the territorial sea or in the internal waters of a State" and was the first international convention to define the high seas.[2] Moreover, the Second Circuit Court of Appeals has recently reached a similar conclusion regarding the definition of the "high seas."[3] In an appeal from the consolidated cases surrounding the TWA Flight 800 crash, the Second Circuit had to determine the congressional meaning of "high seas" as the term was used in the Death on the High Seas Act.[4] After an exhaustive examination of the relevant cases, the court held that, based on the weight of early decisions that addressed the definition, the "high seas" were those waters beyond the territorial waters of the United States.[5] Therefore, the definition of high seas within AS 44.03.010(2) could arguably support extending Alaska's jurisdiction extraterritorially.

Furthermore, subsection two extends state jurisdiction "to the extent that jurisdiction is claimed by the United States of America or to the extent recognized by usages and customs of international law or by agreement to which the United States of America or the state is a party...." Arguably this section of the statute could incorporate by reference the jurisdiction of the United States over its flag ships. The United States governs its flag ships through the federal special maritime and territorial jurisdiction statute. This jurisdiction is defined under 18 U.S.C. § 7 and includes:

> The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.[6]

This statute is the jurisdictional basis for a number of other statutes that invoke the special maritime and territorial jurisdiction of the United States. For example, when a sexual assault against a minor occurs on the high seas, 18 U.S.C. §§ 2243, 2244 are applicable, with each section invoking § 7's special maritime jurisdiction.

Federal courts in a number of circumstances have extended United States jurisdiction into foreign territorial waters.[7] Further, there is no constitutional bar to the extraterritorial application of United States

band of water that extends up to three miles out from the coast").

**2.** Law of the Sea: Convention on the High Seas, Apr. 29, 1958, art. 1, 13 U.S.T. 2312.

**3.** *In re Air Crash Off Long Island, N.Y. on July 17, 1996*, 209 F.3d 200, 207 (2d. Cir.2000).

**4.** *Id.* at 201–02.

**5.** *Id.* at 206–07; *see also In re Air Crash Disaster Near Peggy's Cove, Nova Scotia on Sept. 2, 1998*, 210 F.Supp.2d 570, 580 (E.D.Pa.2002).

**6.** 18 U.S.C. § 7(1).

**7.** *See United States v. Flores*, 289 U.S. 137, 150–59, 53 S.Ct. 580, 582–86, 77 L.Ed. 1086 (1933) (extending jurisdiction to a United States citizen charged with the murder of another United States citizen aboard an American ship in the port of the Belgian Congo 250 miles up the Congo River); *United States v. Rodgers*, 150 U.S. 249, 266, 14 S.Ct. 109, 116, 37 L.Ed. 1071 (1893) (extending jurisdiction to a defendant charged with assaulting another person with a deadly weapon aboard a United States vessel in Canadian territorial waters); *United States v. Neil*, 312 F.3d 419, 421–23 (9th Cir.2002) (extending jurisdiction to a foreign national charged with sexually molesting a United States minor on-board a foreign cruise ship while in Mexican territorial waters); *United States v. Reagan*, 453 F.2d 165, 169–71 (6th Cir.1971) (extending jurisdiction to a United States citizen charged with homicide aboard an American vessel while in a German harbor); *United States v. Ross*, 439 F.2d 1355, 1357–59 (9th Cir.1971) (extending jurisdiction to an assault committed on an American flagged vessel in a harbor of Nha Trang in South Vietnam); *see also In re Air Crash Disaster Near Peggy's Cove*, 210 F.Supp.2d at 586 (concluding that "high seas," as used in the federal Death on the High Seas Act, included foreign territorial waters); *Jennings v. Boeing Co.*, 660 F.Supp. 796, 803–04 (E.D.Pa.1987) (reaching same conclusion as the *Peggy's Cove* court).

penal laws.[8] Whether Alaska could exercise concurrent jurisdiction with the United States would be an issue of federal exclusivity—an issue of domestic rather than international law.[9] Therefore, the court could interpret the language in AS 44.03.010(2) to incorporate by reference the United States's jurisdiction over its flag ships. Interpreted in this way, subsection two would give the State jurisdiction over an Alaska state ferry.

It also seems logical that the State of Alaska would want to extend its jurisdiction extensively to waters far from its coast. As the decisions in *State v. Bundrant*[10] and *Corbin v. State*[11] make clear, Alaska has substantial interests outside its territorial waters. Alaska has an extensive coastline, and activities far from the Alaska coast have a substantial impact on the fishing industry and other Alaska interests.

This is not a recent development, and therefore, in interpreting any statute, it seems reasonable to conclude that the legislature was aware of Alaska's substantial offshore interests and would want to make sure that Alaska could enforce its jurisdiction to the maximum extent possible. The Alaska Ferry System, connecting Alaska by a marine highway to the lower forty-eight states, is simply a more recent example of Alaska's interests and the State's need to extend its jurisdiction to waters offshore of the Alaska coast.

The federal government has limited resources. It might not have an interest in prosecuting any but the most major crimes that occur aboard the Alaska Ferry System. If the State of Alaska does not have jurisdiction in this case, a serious assault might go unremedied.[12] The present case is but one example of a kind of case that occurs outside of Alaska's territorial waters where Alaska has a substantial interest in extending jurisdiction. The facts of *Corbin* present another example.

*Corbin* involved the theft of crab pots outside of Alaska territorial waters.[13] As Jack points out, *Corbin* is of limited legal value in this case because in *Corbin* the defendant did not even think to contest Alaska's jurisdiction sixteen miles from the nearest point of land.[14] But *Corbin* does illustrate the type of relatively small offense that can occur outside of Alaska's territorial waters in which Alaska has a substantial interest. If Alaska could not prosecute such crimes, it appears likely that the federal government might have little interest in prosecuting relatively minor offenses. Many activities vital to Alaska have historically occurred outside of Alaska's territorial waters and continue to occur. Therefore, it seems reasonable that the Alaska Legislature would want to extend Alaska's jurisdiction to these activities.

Therefore, there are substantial grounds to support the State's contention that AS 44.03.010(2) provides the State with jurisdiction over this case. The argument that it does not is already set out by Judges Stewart and Mannheimer, and I will not repeat those arguments. But for me, the argument that the legislature intended to extend state jurisdiction offshore from the coast of Alaska to the maximum extent possible breaks down because there does not appear to be any precedent for this interpretation. Many states in the United States border the ocean. And activities that occur far from these

---

**8.** *See, e.g., Blackmer v. United States*, 284 U.S. 421, 436–38, 52 S.Ct. 252, 254–55, 76 L.Ed. 375 (1932); *Chua Han Mow v. United States*, 730 F.2d 1308, 1311 (9th Cir.1984).

**9.** Restatement (Third) of Foreign Relations Law § 402 cmt. k (1987) ("Whether a State [of the United States] may exercise jurisdiction that the United States is entitled to exercise under international law is ... generally a question only of United States law.").

**10.** 546 P.2d 530 (Alaska 1976).

**11.** 672 P.2d 156 (Alaska App.1983).

**12.** Apparently in response to this and similar cases, the legislature recently passed AS 12.05.020, making it clear that Alaska's jurisdiction does extend to the Alaska Ferry System. Alaska Statute 12.05.020 states: "A person may be prosecuted under the laws of this state for an offense committed on or against ... a ferry or other water craft owned or operated by the state, even if the ... ferry ... is in ... water outside the state when the offense is alleged to have occurred."

**13.** *Corbin,* 672 P.2d at 157.

**14.** *Id.*

states' coastlines could have a substantial impact on these states. But we have been unable to find any statute or authority by which a state has attempted to exert jurisdiction as broadly as the State claims that the State of Alaska intended to exert its jurisdiction in AS 44.03.010(2). And, in fact, where coastal states have exerted jurisdiction over crimes that occurred on the high seas, the states have asserted this jurisdiction based on specific narrow statutes addressing particular conduct.

For instance, in *Bundrant,* the Alaska Supreme Court relied on a specific statute that granted the State jurisdiction to regulate the crabbing industry outside Alaska's territorial waters.[15] Similarly, in *Skiriotes v. Florida,*[16] the United States Supreme Court upheld Florida's enforcement of a statute that prohibited the use of diving equipment to take sponges from the Gulf of Mexico off the coast of Florida.[17] And, in *Florida v. Stepansky,*[18] the Supreme Court of Florida held that Florida could prosecute a burglary and attempted sexual battery that occurred approximately 100 nautical miles from the coast of Florida. But the prosecution of *Stepansky* was upheld under a narrow Florida statute that applied to voyages "on which over half of the revenue passengers on board the ship originally embarked and planned to finally disembark in [Florida]."[19]

The fact that other states with offshore interests similar to Alaska's do not appear to have broad statutes asserting extensive jurisdiction causes me to conclude that the Alaska Legislature did not intend for AS 44.03.010(2) to be interpreted as broadly as the State suggests. It appears that, after examining how other states assert jurisdiction offshore from their coastlines, such an assertion of jurisdiction would be unprecedented. If the legislature intended such a broad and unprecedented assertion of jurisdiction, I am confident that some legislative

history would exist that would clarify the legislature's intent. I therefore conclude that AS 44.03.010(2) must be interpreted, as the lead opinion suggests, to exclude the exercise of the State's jurisdiction in this case.

MANNHEIMER, Judge, concurring.

The issue in this case is whether Alaska has criminal jurisdiction over an assault that allegedly occurred in May 2001 on a state ferry as it navigated the territorial sea of Canada—that is, as it passed through the twelve-mile-wide band of ocean that lies off the western coast of Canada.

In 2002, the Alaska legislature enacted AS 12.05.020, a statute that asserts Alaska's authority to prosecute any criminal offense "committed on ... a ferry or other watercraft owned or operated by the state, even if the ... ferry ... or watercraft is in ... water outside the state when the offense is alleged to have occurred."[1] But the offense in the present case is alleged to have occurred in May 2001, and the State does not assert that the 2002 statute applies here.

Instead, the State relies on AS 44.03.010(2), a statute passed in 1959 during our first year of statehood.[2] This statute declares that the jurisdiction of the State of Alaska "extends to water offshore from the coast of [this] state ... [in] the high seas to the extent that jurisdiction is claimed by the United States of America, or to the extent recognized by the usages and customs of international law or by agreement to which the United States of America or [this] state is a party."

I agree with my colleagues that this statute does not establish Alaska's authority to enforce its criminal laws in the territorial waters of Canada. In fact, as I interpret AS 44.03.010(2), it does not even *assert* jurisdiction over crimes committed outside the territory of Alaska. I therefore conclude that,

---

**15.** *Bundrant,* 546 P.2d at 533 (outlining the Bering Sea Shellfish Area Regulations).

**16.** 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941).

**17.** *Id.* at 77–79, 61 S.Ct. at 929–30.

**18.** 761 So.2d 1027 (Fla.2000).

**19.** *Id.* at 1029 n. 1.

**1.** *See* SLA 2002, ch. 87, § 1.

**2.** *See* SLA 1959, ch. 89, § 1.

before the enactment of AS 12.05.020 in 2002, Alaska did not assert criminal jurisdiction over offenses committed in Canada's territorial sea. (And I express no opinion concerning the effect of AS 12.05.020.)

I am writing separately because I reach this conclusion for reasons somewhat different from the ones described in Judge Stewart's lead opinion and Judge Coats's concurring opinion.

### Summary of my position

Under international law, there are several rationales that a nation might properly rely on when asserting extra-territorial jurisdiction over particular people or activities—that is, when that nation seeks to enforce its civil or criminal laws within the geographic territory of another nation. For example, under admiralty law, a nation has the right to enforce its laws onboard any ship flying that nation's flag, regardless of the geographic location of the ship. But all of the rationales for a nation's assertion of extra-territorial jurisdiction depend on the nation's acknowledged interest in the specific people or activities to be regulated.

In contrast, no nation can assert *territorial* jurisdiction within the boundaries of another nation. That is, no nation has the right to enforce its entire body of civil and criminal law against all people and activities within a geographic area that lies within the recognized borders of another nation.

For reasons explained in more detail below, I conclude that AS 44.03.010 was intended to be an assertion of Alaska's territorial jurisdiction. The statute does not seek to regulate particular people or activities based on their relationship to this state. Rather, the statute asserts Alaska's right to enforce all of its laws within a geographic area. But under international law, no nation can assert territorial jurisdiction over a geographic area

that lies within the territory of another nation. Thus, AS 44.03.010 can not properly be interpreted as an assertion of Alaska's jurisdiction over the territorial waters of Canada.

I therefore agree with my colleagues that we must uphold the superior court's decision in this case: the criminal complaint against Jack must be dismissed because Alaska had no authority to enforce its criminal laws within Canada's territorial sea.

### The traditional categorization of pelagic waters under international law

The pelagic waters of the earth have traditionally been divided into three legal categories: the "inland waters" of coastal nations, the "territorial" or "marginal" seas of coastal nations, and the "high seas"—*i.e.,* all areas of the oceans that are not within any nation's inland waters or territorial sea. *See United States v. Louisiana* (the "Louisiana Boundary Case"), 394 U.S. 11, 21–23, 89 S.Ct. 773, 780–81, 22 L.Ed.2d 44 (1969).

A nation's inland waters comprise any portions of the ocean that are mostly enclosed by that nation's land—for instance, the waters of a narrow-mouthed bay, or a sound or sea passage bounded by a string of barrier islands. Inland waters are considered as much a part of the nation's territory as its land; the nation exercises complete sovereignty over inland waters, to the exclusion of all other sovereigns.[3]

A nation's territorial sea is the band of ocean within a certain fixed distance seaward from the low-tide line along the nation's coast (or, in some instances, the low-tide line on the seaward side of its barrier islands).[4] Within this territorial sea, a nation exercises normal sovereignty with one major exception: it can not forbid passage to peaceful vessels of other nations (known as the right of "innocent passage").[5]

---

**3.** *United States v. Louisiana,* 394 U.S. at 22, 89 S.Ct. at 780.

**4.** *Compare United States v. Louisiana,* 470 U.S. 93, 112–13, 105 S.Ct. 1074, 1085, 84 L.Ed.2d 73 (1985) (holding that Mississippi Sound, which is bounded by a string of islands, constitutes the inland waters of Mississippi and Louisiana) *with United States v. California,* 381 U.S. 139, 161–

167, 85 S.Ct. 1401, 1414–1417, 14 L.Ed.2d 296 (1965) (holding that California's inland waters do not extend all the way to Santa Catalina Island).

**5.** *United States v. Louisiana,* 394 U.S. at 22–23, 89 S.Ct. at 780–781; *United States v. Alaska,* 422 U.S. 184, 197, 95 S.Ct. 2240, 2250, 45 L.Ed.2d 109 (1975). *See also American Telephone & Telegraph Co. v. M/V Cape Fear,* 967 F.2d 864, 874,

The width of the territorial sea was traditionally three miles,[6] but it is now of varying width because many countries claim more than three miles. The 1982 United Nations Convention on the Law of the Sea (UNCLOS) declares the right of coastal nations to assert jurisdiction over a territorial sea of up to twelve miles' width.[7] Although neither the United States nor Canada has ratified this treaty,[8] the treaty is generally regarded as an accurate expression of the law of nations,[9] and both the United States and Canada now claim a twelve-mile territorial sea.[10]

All ocean waters outside any nation's territorial sea were traditionally considered the "high seas"—a geographic area where no nation could lawfully assert territorial sovereignty. This is not to say that nations had absolutely no power to enforce their laws on the high seas. International law recognized a nation's right to assert jurisdiction over specified people, objects, or activities on the high seas for particular purposes. For instance, under admiralty law, a nation can assert sovereignty over the ships flying that nation's flag, wherever those ships might be located on the planet.

But no nation could assert territorial jurisdiction over the high seas. That is, no nation could enact laws to regulate a geographic region of the high seas, nor could a nation enforce its body of laws within a geographic region of the high seas.

This tripartite division of the ocean is no longer as straightforward as it once was. Article 33 of the United Nations Convention on the Law of the Sea recognizes the right of nations to declare a "contiguous zone" not exceeding twenty-four miles beyond their coast (*i.e.*, a zone that extends an additional twelve miles beyond the twelve-mile territorial sea allowed by the treaty). Within this zone, a coastal nation exercises limited sovereignty: "the control necessary to ... prevent infringement of its customs, fiscal, immigration[,] or sanitary laws and regulations within its territory or territorial sea [and] punish infringement of the above laws and regulations committed within its territory or territorial sea".

(Again, although neither the United States nor Canada has ratified UNCLOS, both nations have claimed a contiguous zone of twenty-four miles—that is, a zone extending twelve miles beyond their twelve-mile territorial seas).[11]

1992 A.M.C. 2492 (3rd Cir.1992). The right of innocent passage is codified in the United Nations Convention on the Law of the Sea (1982), Articles 17–26.

**6.** *See United States v. Louisiana,* 394 U.S. at 41, 89 S.Ct. at 791.

**7.** UNCLOS, Article 3. The full text of this treaty is available at the United Nations web site (last visited March 18, 2003):

http://www.un.org/Depts/los/convention_agreements/ convention_overview_convention.htm

**8.** A listing of all the nations that signed the treaty, and whether their governments have formally ratified the treaty, is available at the United Nations web site (last visited March 18, 2003): http://www.un.org/Depts/los/reference_files/status2003.pdf

**9.** *See* Thomas J. Schoenbaum, *Admiralty and Maritime Law* (2nd ed.1994), § 2–2, Vol. 1, p. 23, quoting *United States: Proclamation on an Exclusive Economic Zone,* 22 I.L.M. 461 (1983).

**10.** The United States extended its territorial sea from 3 miles to 12 miles in 1988. *See* Presidential Proclamation No. 5928, 54 Fed. Register 777

(1988) (discussed in *In re Air Crash Off Long Island, New York, on July 17, 1996,* 209 F.3d 200, 212–13 (2nd Cir.2000). Although the United States has not ratified the 1982 United Nations Convention on the Law of the Sea, the 1988 presidential proclamation incorporates the provisions of UNCLOS pertaining to other nations' right of innocent passage through territorial waters and through international straits. The proclamation states that these matters are to be "determined in accordance with international law, as reflected in the applicable provisions of the 1982 United Nations Convention on the Law of the Sea."

Canada extended its territorial sea from 3 miles to 12 miles in 1996. *See* Oceans Act, S.C., part 1, ch. 31, § 4 (1996) (Can.) (cited in *In re Air Crash Disaster Near Peggy's Cove, Nova Scotia on September 2, 1998,* 210 F.Supp.2d 570, 572 (E.D.Pa.2002)).

**11.** United States: Presidential Proclamation of September 2, 1999 (No. 7219), 64 Fed.Reg. 48701 (1999).

Canada: See the web site of the Canadian Oceans Directorate (last visited March 18, 2003: http://www.pac.dfo-mpo.gc.ca/oceans/OceansÄct/OAPart1.htm

Moreover, international law now recognizes a country's right to assert *economic* sovereignty over the ocean up to 200 miles from its shores. Under Articles 56–57 of UNCLOS, a coastal nation may establish an "exclusive economic zone" (an "EEZ") extending up to 200 miles into the ocean. Within this zone, the coastal nation has: "sovereign rights for the purpose of exploring and exploiting, conserving and managing the natural resources, whether living or non-living, of the waters superjacent to the sea-bed [as well as] the sea-bed and its subsoil." [12] Within a coastal nation's EEZ, the nation is also sovereign for purposes of "the economic exploitation and exploration of the zone, such as the production of energy from the water, currents[,] and winds," as well as "the protection and preservation of the marine environment." [13]

(Again, both the United States and Canada claim 200 mile exclusive economic zones.[14])

The creation of exclusive economic zones in the ocean has required a modified definition of "high seas." Currently, under Article 86 of UNCLOS, the term "high seas" means those areas of the ocean that are outside any nation's inland waters, territorial sea, *or* exclusive economic zone. But the designation "high seas" continues to mean the same thing—a geographic area beyond any nation's territorial jurisdiction. Article 89 of UNCLOS declares, "No State may validly purport to subject any part of the high seas to its sovereignty."

*The maritime boundary between the United States and Canada in the North Pacific*

As described above, both the United States and Canada claim a twelve-mile territorial sea, an additional twelve-mile contiguous zone, and a 200 mile exclusive economic zone. A question naturally arises with regard to regions such as Puget Sound and Dixon Entrance, where the coasts of the two nations are adjacent and face each other. This question is answered by Articles 15 and 74 of UNCLOS. Article 15 declares:

Where the coasts of two States are opposite or adjacent to each other, neither of the two States is entitled, failing agreement between them to the contrary, to extend its territorial sea beyond the median line every point of which is equidistant from the nearest points on the baselines from which the breadth of the territorial seas of each of the two States is measured. The above provision does not apply, however, where it is necessary by reason of historic title or other special circumstances to delimit the territorial seas of the two States in a way which is at variance therewith.

Similarly, under Article 74 of UNCLOS, when adjacent nations share a sea border, they are to equitably define their respective exclusive economic zones.

To put geographic reality to the rules enunciated in Articles 15 and 74 of UNCLOS, the United States and Canada have established an International Boundary Commission to define the exact lines in the ocean that divide our two countries. The descriptions of these lines—given in terms of reference points that are defined to the hundredth of a second of latitude and longitude—are available at the International Boundary Commission's web site: www.internationalboundarycommission.org/ibcprod.htm# coord (last visited March 24, 2003).

A chart and a data table describing the boundaries of the Alaska region of the United States' exclusive economic zone are available at the web site of the Office of Coast Survey (an agency of the National Oceanic and Atmospheric Administration): http://chartmaker.ncd.noaa.gov/csdl/eez.htm (last revised December 9, 2002).

According to this Coast Survey data table, the border of the United States' EEZ heads west through the middle of Dixon Entrance (approximately Latitude 54° 30′ North), and

12.  UNCLOS, Article 56.

13.  *Id.*

14.  United States: Presidential Proclamation No. 5030, 48 Fed. Register 10605 (1983).

Canada: See the web site of the Canadian Oceans Directorate (last visited March 18, 2003): http://www.pac.dfo-mpo.gc.ca/oceans/OceansÄct/OAPart1.htm

then it proceeds mostly due west across the Gulf of Alaska. At Longitude 138° 46′ West (over 300 miles west of Queen Charlotte Island), it reaches its southernmost point: Latitude 53° 28′ North. From there, it angles northward as it continues west, reaching a latitude of 56° 34′ North before angling south again as it approaches the Kenai Peninsula and Kodiak Island.

### What does AS 44.03.010 mean?

AS 44.03.010 declares that "the jurisdiction of the [State of Alaska] extends to water offshore from the coast of [this] state" as described in the three subsections of the statute:

Subsection (1) of the statute asserts Alaska's jurisdiction over "the marginal sea to its outermost limits[,] as those limits are from time to time defined or recognized by the United States of America by international treaty or otherwise." As explained above, the United States now claims a "marginal sea"—that is, a territorial sea—of twelve miles' width.

Subsection (2) of the statute asserts Alaska's jurisdiction over "the high seas to the extent that jurisdiction is claimed by the United States of America, or to the extent recognized by the usages and customs of international law or by agreement to which the United States of America or [this] state is a party."

Finally, subsection (3) of the statute asserts Alaska's jurisdiction over "[all] submerged land[,] including the subsurface of submerged land, lying under the water mentioned in [subsections (1) and (2) ]".

AS 44.03.010 obviously raises several issues of international law, as well as issues of federal supremacy and pre-emption. But in the present case, the pertinent question is whether this statute asserts Alaska's authority to enforce its criminal laws within the territorial sea of Canada. The State argues that subsection (2) of the statute—the sub-section dealing with the high seas—constitutes just such an assertion of jurisdiction.

There is Alaska case law to support the proposition that a state can enforce its criminal jurisdiction outside its territorial waters if the state can show a significant state interest, and if the state's exercise of this jurisdiction does not conflict with federal jurisdiction. See *State v. Bundrant*[15] and *Corbin v. State*,[16] which both involved Alaska's right to enforce its laws within ocean areas lying outside the United States' territorial sea.

But aside from potential conflicts with federal sovereignty, a state's assertion of jurisdiction outside its territorial waters must not conflict with international law and the sovereign rights of another nation. Neither *Bundrant* nor *Corbin* addressed this issue, because neither case involved an attempt to enforce Alaska law in a geographic area lying within the territorial sea of another nation. But that is the issue in this case: whether Alaska can exercise jurisdiction over crimes alleged to have occurred in Canadian territorial waters.

There are two potential legal theories that might justify Alaska's assertion of jurisdiction over such crimes. The first is an admiralty theory: the State of Alaska owns and operates the ferry on which the crime allegedly occurred, so the State could assert the right to enforce its laws on the ferry regardless of where the ferry might be located. The second is a citizenship or residency theory: the State could assert jurisdiction because the victim of the alleged crime is an Alaska resident.

The admiralty theory of jurisdiction might be questioned because Alaska does not "flag" ships the way that the United States and other nations do. Nevertheless, the United States Supreme Court has stated that "state regulation [in the area of admiralty] is permissible, absent a clear conflict with the federal law."[17] Thus, as the Ninth Circuit has recognized, "[the] states may supplement federal admiralty law as applied to matters of local concern, so long as state law does not

---

**15.** 546 P.2d 530 (Alaska 1976).

**16.** 672 P.2d 156 (Alaska App.1983).

**17.** *Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 341, 93 S.Ct. 1590, 1600, 36 L.Ed.2d 280 (1973).

actually conflict with federal law or interfere with the uniform working of the maritime legal system."[18]

Given this construction of federal admiralty law, one could argue that the State of Alaska is empowered to assert criminal jurisdiction over people and activities onboard ships that bear a special relation to Alaska—such as the ships described in our new statute, AS 12.05.020 (i.e., ferries and other watercraft owned and operated by the State of Alaska).

The second potential theory of jurisdiction—jurisdiction based on the residency of the crime victim—also finds support in the law. See State v. Stepansky, 761 So.2d 1027 (Fla.2000), a case in which the Florida Supreme Court upheld that state's authority to prosecute a burglary and attempted sexual assault committed aboard a Liberian-flagged cruise ship that was located approximately 100 nautical miles from the Florida coast. The prosecution was found to be proper under Florida Statute § 910.006, which asserts that state's "special maritime criminal jurisdiction" over any crime committed on board a ship when (among other things) the suspect is a citizen or resident of Florida, the victim is a resident of Florida, or the crime occurred during a voyage on which over half of the paid passengers on board the ship originally embarked and plan to finally disembark in Florida.

Thus, there are at least two recognized theories of law that might justify the legislature's recent enactment of AS 12.05.020, the statute that asserts Alaska's jurisdiction to prosecute crimes committed onboard state ferries. But the question in this case is whether our pre-existing statute, AS 44.03.010, likewise asserts Alaska's jurisdiction over crimes committed onboard oceangoing vessels in the waters of other countries.

The language of AS 44.03.010, as well as the language of the other statutes that com-

prise AS 44.03, all indicate that AS 44.03.010 was not intended to be an assertion of special jurisdiction—i.e., not intended to be an assertion of jurisdiction based on a vessel's particular relationship to the State of Alaska, or based on the effect that a particular criminal act might have on the residents of this state. Rather, AS 44.03.010 was intended to be a straightforward assertion of territorial jurisdiction—i.e., an assertion of the State's jurisdiction to enforce its entire body of law within particular geographic areas.

The first subsection of AS 44.03.010 is clearly an assertion of territorial jurisdiction. Subsection (1) declares that the State of Alaska asserts jurisdiction over the "marginal sea"—i.e., the territorial sea—lying off the coast of Alaska. As explained above, both international law and federal law define the territorial sea as a geographic area. It is the band of ocean extending twelve miles from Alaska's coast, but expressly excluding the territorial sea of Canada.

(There is apparently some dispute as to whether AS 44.03.010(1) asserts jurisdiction over the territorial sea as it currently is defined (i.e., twelve miles wide) or as it was defined when the statute was enacted (i.e., three miles wide). There is a group of cases currently pending before this Court—State v. Dupier et al., File Nos. A–8270, 8272, and 8273—in which the State's brief asserts that Alaska's jurisdiction over the territorial sea extends only three miles from our coast. I leave this issue for another day.)

The second subsection of AS 44.03.010 is admittedly more ambiguous. Subsection (2) asserts Alaska's jurisdiction over "the high seas to the extent that jurisdiction is claimed by the United States of America, or to the extent recognized by the usages and customs of international law or by agreement to which the United States of America or [this] state is a party."

The State would have us interpret this language as an assertion of special (as op-

<hr>

18. Pacific Merchant Shipping Ass'n v. Aubry, 918 F.2d 1409, 1422 (9th Cir.1990). See, e.g., Ray v. Atlantic Richfield Co., 435 U.S. 151, 160, 172–73, 98 S.Ct. 988, 995, 1001–02, 55 L.Ed.2d 179 (1978) (upholding Washington state laws that required larger ocean-going vessels to take on a state-licensed pilot when entering Puget Sound and to be escorted by a tug boat while in the Sound). See also Thomas J. Schoenbaum, Admiralty and Maritime Law (2nd ed.1994), § 2–5, Vol. 1, pp. 26–27.

posed to territorial) jurisdiction. In the State's view, the Alaska Legislature enacted this subsection for the purpose of asserting the State of Alaska's jurisdiction over any person or occurrence on the high seas if the United States could claim jurisdiction over that person or occurrence under any provision of federal law, or under "the usages and customs of international law."

But this interpretation of Subsection (2) makes no sense in light of Subsection (3). Subsection (3) of the statute asserts Alaska's jurisdiction over "[all] submerged land[,] including the subsurface of submerged land, lying under the water mentioned in [Subsections (1) and (2)]". This claim of sovereignty over submerged land and its subsoil only makes sense if Subsection (2), like Subsection (1), was intended to refer to a particular *geographic* area of the world. It seems wildly unlikely that the Alaska Legislature meant to assert Alaska's sovereignty over whatever submerged land happens to lie beneath an ocean-going vessel that carries Alaskan passengers or that operates out of an Alaska port. Moreover, such a claim would be completely contrary to international law.

The State's suggested interpretation of AS 44.03.010(2) is further undercut by the language of its sibling provision, AS 44.03.020. In this statute, the State of Alaska claims not only jurisdiction but *ownership* "of the water and submerged land described in AS 44.03.010" (unless some other person or entity has a superseding deed). Again, if this statute was intended to assert ownership over whatever submerged land happens to lie

beneath an ocean-going vessel that carries Alaskan passengers or that operates out of an Alaska port, such a claim would be inconsistent with admiralty law and inconsistent with other doctrines of special jurisdiction (such as jurisdiction based on citizenship or residency). The statute's claim of ownership makes sense only if AS 44.03.010 was intended to be an assertion of territorial jurisdiction over a geographic area.

This conclusion is additionally bolstered by the language of another sibling provision, AS 44.03.030(1). This statute declares that the jurisdiction claimed in AS 44.03.010 is not intended to "limit or restrict . . . the jurisdiction of [Alaska] over a person or subject inside or outside [this] state that is exercisable by reason of citizenship, residence, or other reason recognized by law." But if the jurisdiction claimed in AS 44.03.010 is not intended to restrict or limit the jurisdiction that Alaska might claim because of citizenship, residence, or admiralty, it necessarily follows that AS 44.03.010 does not *itself* constitute a claim of jurisdiction based on citizenship, residence, or admiralty. Rather, it is a claim of territorial jurisdiction.

Thus, AS 44.03.010(2) is an assertion of territorial jurisdiction, not an assertion of admiralty jurisdiction or other special jurisdiction. In effect, AS 44.03.010(2) constitutes the State of Alaska's effort to "piggyback" and obtain the benefit of any federal assertion of territorial jurisdiction over a geographic region of the high seas (as that term was understood in 1959).[19]

---

**19.** In 1959, when AS 44.03 was enacted, the "high seas" began at the seaward edge of the territorial sea. One might argue that, because the United States now claims a contiguous zone of twenty-four miles (*i.e.*, a zone that extends for several miles into the "high seas" as that term was understood in 1959), the State of Alaska—pursuant to AS 44.03.010(2)—also asserts jurisdiction over this contiguous zone. (This is only arguable, because the presidential proclamation that established the contiguous zone expressly declares that "[n]othing in this proclamation . . . amends existing Federal or State law.")

But for purposes of resolving the present case, even if the United States' claim of a twenty-four mile contiguous zone were interpreted as working an extension of Alaska's jurisdiction under AS 44.03.010(2), it would not extend Alaska's jurisdiction into Canadian territorial waters—be-

cause the presidential proclamation that established the contiguous zone expressly states that, although "the contiguous zone of the United States extends to 24 nautical miles from the [coastal] baselines of the United States," the United States disavows any claim that its contiguous zone extends "within the territorial sea of another nation."

Similarly, although the United States now claims a 200 mile exclusive economic zone in the Pacific Ocean, that zone does not include the territorial seas and exclusive economic zones of other nations. In particular, it does not include the territorial sea and exclusive economic zone of Canada. Moreover, within this zone, the United States claims only the economic sovereignty described in Articles 56–57 of UNCLOS—not comprehensive civil and criminal sovereignty. Thus, even if the State of Alaska's sovereignty

But it is clear that the United States does not assert territorial jurisdiction over Canada's territorial sea. Thus, AS 44.03.010(2) does not assert the State of Alaska's jurisdiction to prosecute a sexual assault committed in Canadian territorial waters, even if the sexual assault is committed against an Alaska resident on a state-operated ferry.

*Conclusion*

As I indicated before, I intend to express no opinion concerning the legality and effect of AS 12.05.020, the new statute that expressly asserts Alaska's jurisdiction to prosecute all crimes committed on state-operated ferries, regardless of their geographic location. However, I do conclude that AS 44.03.010 does not constitute an assertion of jurisdiction over such crimes.

Because the State of Alaska relies solely on AS 44.03.010(2) as the jurisdictional basis for its prosecution of Jack in the present case, I agree with my colleagues that the State of Alaska has failed to show jurisdiction over this alleged crime, and the superior court properly dismissed this prosecution.

over the high seas was conceivably extended when the United States government proclaimed this country's exclusive economic zone, this lim-

ited sovereignty would not include the authority to enforce Alaska's criminal laws in the territorial waters of Canada.